18-496-cr (L)
*United States v. Black*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: August 14, 2018                    Decided: March 18, 2019)

Docket Nos. 18-496-cr(L), 18-548-cr(XAP), 18-574-cr(XAP)

_____

UNITED STATES OF AMERICA,

*Appellant–Cross-Appellee*,

v.

RODSHAUN BLACK, AKA Rashaun Black, AKA Shaun,

*Defendant-Appellee*,

DANIEL RODRIGUEZ, AKA Danny, ERNEST GREEN, AKA Ern,

*Defendants-Appellees–Cross-Appellants*.[*]

_____

Before: NEWMAN and POOLER, *Circuit Judges*, and COTE, *District Judge*.[†]

_____

[*] The Clerk of the Court is directed to amend the caption as above.
[†] Judge Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

The United States appeals from the judgment of the United States District Court for the Western District of New York (William M. Skretny, *J.*) granting Rodshaun Black, Daniel Rodriguez, and Ernest Green's motion to dismiss the remaining criminal charges against them on Sixth Amendment speedy trial grounds. Due to a panoply of delays, Black, Rodriguez, and Green were not tried until approximately sixty-eight months after they were first indicted. For two years of that time, the government failed to render a decision on whether Defendants-Appellees would face the death penalty.

On appeal, the government principally argues that the district court should not have attributed two years' delay to the government for its prolonged death-penalty decision and that the district court should have held Black, Rodriguez, and Green responsible for more of the delay than it did. Applying the factors outlined in *Barker v. Wingo*, 407 U.S. 514 (1972), we hold that the delay was an unconstitutional deprivation of Black's, Rodriguez's, and Green's Sixth Amendment rights to a speedy trial. Accordingly, we AFFIRM the judgment of the district court.

Judge Cote concurs in the judgment in part and dissents in part in a separate opinion.

Affirmed.

————————————

MICHAEL P. FELICETTA, Assistant United States Attorney (Tiffany H. Lee, Assistant United States Attorney, *on the brief*), *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Rochester, NY, *for Appellant–Cross-Appellee.*

DONALD M. THOMPSON, Easton Thompson Kasperek Shiffrin, LLP, Rochester, NY, *for Defendant-Appellee Rodshaun Black.*

BARRY N. COVERT, Lipsitz Green Scime Cambria LLP (Erin E. McCampbell, *on the brief*), Buffalo, NY, *for Defendant-Appellee–Cross-Appellant Daniel Rodriguez.*

JESSE C. PYLE, Harrington & Mahoney (James P. Harrington, *on the brief*), Buffalo, NY, *for Defendant-Appellee–Cross-Appellant Ernest Green.*

POOLER, *Circuit Judge*:

The case before us treads on familiar ground—the fundamental protections for criminal defendants that are enshrined in the Sixth Amendment to the Constitution. Defendants-Appellees Rodshaun Black, Daniel Rodriguez,

3

and Ernest Green (collectively, "Defendants-Appellees") were indicted on March 6, 2012, and charged with one count of Hobbs Act conspiracy. On March 7, 2012, prosecutors informed the district court that the case against Defendants-Appellees might become eligible for capital prosecution. Two years and nine months later, having not yet reached a decision on whether to seek the death penalty, the prosecution filed a superseding indictment that added new charges and accused Green and Black of an entirely new crime. On January 13, 2015—two years and ten months after the government informed Defendants-Appellees that they could face capital prosecution—the government decided that it would not seek the death penalty. With the nature of the case finally settled, it took another two years and ten months to bring Defendants-Appellees to trial. In all, Defendants-Appellees waited sixty-eight months for a trial.

Today we hold for the third time in two years that criminal defendants' rights to a speedy trial have been violated in the Western District of New York. *United States v. Tigano*, 880 F.3d 602 (2d Cir. 2018); *United States v. Pennick*, 713 F. App'x 33 (2d Cir. 2017) (summary order). Defendants-Appellees endured an extraordinary sixty-eight-month delay, suffered anxiety occasioned by the

4

government's nearly three-year deliberation over whether to argue that they should be sentenced to death, and repeatedly requested a speedy trial. Accordingly, we AFFIRM the district court's dismissal of the remaining charges against Defendants-Appellees because Defendants-Appellees' rights to a speedy trial were violated.

## BACKGROUND

### I.     Proceedings on the Original Indictment

On March 6, 2012, a grand jury indicted Rodshaun Black, Daniel Rodriguez, and Ernest Green on one count of Hobbs Act conspiracy. Rodriguez was arraigned on the charge on March 7, Green on March 9, and Black on March 13.

Although Black, Green, and Rodriguez were all confined in federal custody during the pendency of this case, each was detained under different circumstances. Black was serving a state sentence when he was arraigned on the federal charges; Green was arrested and detained on February 24, 2012, to answer to the charges in this case; and Rodriguez was at large at the time of the indictment and was subsequently arrested and detained on March 7, 2012.

**A. The Government's Death-Penalty Decision**

During Rodriguez's arraignment hearing on March 7, the government

alerted the court that the case might become a capital case. Specifically, the

prosecution informed the district court:

> [T]here is the possibility if not [the] likelihood of additional charges down the road. . . . [I]n terms of appointment of counsel, it could be a death penalty eligible case, Judge. So, no decisions have been made in that regard obviously, no charges have brought in that regard yet. But I would just urge the Court to appoint[] experienced counsel.

Gov't App'x at 102. Thereafter, Black, Green, and Rodriguez were each

appointed learned counsel.

Mindful of the government's statements regarding death-eligible charges,

the magistrate judge (to whom all pre-trial matters were referred) gave the

parties until April 9, 2012, to complete discovery. But on the day discovery was

scheduled to close, the government sought an extension to facilitate obtaining

additional discovery from law-enforcement agencies and to accommodate the

prosecutor's vacation. The court granted a three-week extension until April 30,

2012, with pre-trial motions due on May 29, 2012.

With discovery in progress, Defendants-Appellees expressed concern that the pre-trial motion deadline would force them to submit motions before the government had issued its decision on whether to seek the death penalty, which would necessarily change the posture of the defense and impact Defendants-Appellees' arguments in their motions. Therefore, on April 19, Black, Rodriguez, and Green requested adjournment of the pre-trial motion deadline until the government had issued its death-penalty decision. The court granted the motion and vacated the pre-trial motion deadlines, with the intention of setting new deadlines when it could assess the government's progress on the death-penalty decision at a May 11, 2012, status conference. That status conference was subsequently postponed until May 17, 2012, because the government failed to produce the defendants.

At the May 17 conference, speedy trial concerns permeated the hearing. The government admitted that it had "not requested authorization from Washington" to seek the death penalty. Gov't App'x at 126. Nonetheless, the government simultaneously objected to Defendants-Appellees' request to defer pre-trial motion practice until the government issued a notice of intent. "[T]he

7

government should not be in a position to have to justify speedy trial exclusions when the government is more than ready and satisfied to proceed in this case with the schedule," the prosecutor informed the court. Gov't App'x at 127. Defendants-Appellees indicated that they would be amenable to a limited exclusion of time from the speedy trial clock, but they remained hesitant to proceed with motions without a decision because if the government sought the death penalty, the defense would need to scrap existing motions and begin anew. Counsel for Green then noted, "My client has indicated to me that he will agree to a definite extension of the motion schedule, but he is anxious to have this case move along." Gov't App'x at 132. Counsel for Rodriguez and Black echoed this concern. Striking a middle ground, the court extended the deadline for filing motions to July 28, 2012.

But by July 24, 2012—just four days before the deadline—the government still had not determined whether it would seek the death penalty. Defendants-Appellees therefore moved for an extension of time to file pre-trial motions pending the government's decision, noting that the government had informed them that it expected to have a decision within sixty days. At a status conference

on August 2, 2012, the government told the court that the decision might come in October. Nonetheless, Defendants-Appellees expressed a desire to press forward on the assumption that the government would not bring a superseding indictment. Heeding this request, the court made pre-trial motions due on September 28, 2012. Defendants-Appellees timely filed their motions, and after receiving a 10-day extension, the government responded to Defendants-Appellees' motions.

At a December 4, 2012, hearing on the motions, the court again addressed Defendants-Appellees' concerns about obtaining a speedy trial in the face of the government's ever-pending death-penalty decision. The government refused to provide a timeline for its decision—noting, "Obviously my prediction games have been inaccurate so far, so I'm sort of hesitant to keep predicting." Gov't App'x at 179. The government at first indicated that the Department of Justice was proceeding with the death-penalty process, but after further prodding from the court, it disclosed that, in fact, the prosecution had not met with the Department of Justice to discuss whether to seek the death penalty.

**B. Delay Due to Missing Evidence**

While the government contemplated its death-penalty decision, the parties engaged in extensive litigation regarding the unexplained disappearance of several of the photo arrays that law enforcement had shown to witnesses to identify Defendants-Appellees. Defendants-Appellees requested additional discovery and to suppress identification evidence on December 28, 2012. On February 5, 2013, with some of the arrays still missing, the court ordered the government to produce all photo arrays used to identify Defendants-Appellees. The government failed to produce one of the photo arrays that Rodriguez sought, and on March 11, 2013, the court directed the government to consult with the Buffalo Police Department again, which had previously claimed that the photo array used to identify Rodriguez was not in its possession.

On June 7, 2013, with little headway being made on locating the photo arrays, the court issued a scheduling order giving the government until June 21, 2013, to make supplemental disclosures related to the photo arrays. Then, on the day of the deadline, the government sought and obtained a two-week extension

to make supplemental disclosures to accommodate the prosecutor's military commitments.

On August 14, the court decided that an evidentiary hearing was necessary to resolve the pending pre-trial motions and scheduled a hearing for October 2, 2013—a full fifty days from the order. But even this date was not to be: the government moved to adjourn the hearing due to the lead prosecutor's commitments in another case and a death in his family. The court rescheduled the hearing for November 6, 2013. But on November 6, the government requested another adjournment because one of the government's witnesses was unavailable. The hearing was rescheduled a third time for December 3, 2013. But on December 3, the government failed to produce Black, and the hearing had to be rescheduled for December 20. On December 20, the government *again* failed to produce Black, and the hearing was rescheduled for February 19, 2014. Finally, on February 19, 2014—140 days after it was originally scheduled—the court held a hearing at which it ordered the government to look again for the missing photo array and for any documents regarding the missing photo array's parameters. The court also scheduled a follow-up hearing for March 7, 2014, if necessary.

11

The hearing was necessary. Defendants-Appellees argued that the government had not produced all documents and witnesses related to the photo arrays. The court gave Defendants-Appellees until March 24, 2014, to file supplemental motions regarding unproduced witnesses and discovery. On March 19, 2014, Defendants-Appellees moved for an extension of that deadline, and the court moved the deadline to April 14, 2014. But after the government informed Defendants-Appellees that the missing photo arrays had been discovered in a retired police detective's house, Rodriguez requested additional time. The court vacated the scheduling order and set a conference for May 8, 2014, that was subsequently accelerated to April 18, 2014, by consent of the parties. Defendants-Appellees filed additional motions regarding the photo arrays on April 21 and April 23.

By the end of June, both sides reported that after meeting and conferring, the remaining discovery disputes were largely resolved. Following a one-day adjournment requested by Black's counsel, on August 19, 2014, the court held oral argument on the last of the parties' suppression motions and reserved decision. On August 22, 2014, however, the judge decided another evidentiary

12

hearing was necessary and scheduled one for October 14, 2014. On August 28, Black requested that the evidentiary hearing be delayed by two weeks. The magistrate granted the request, and the court held an evidentiary hearing and reserved decision on October 28, 2014.

## II.    Proceedings on the Superseding Indictment

Before the magistrate judge issued his report and recommendation, on December 12, 2014, the government filed a nine-count superseding indictment. The indictment charged Green, Black, and Rodriguez and Amilcar Ramos and John Coronado with the following in relation to the murder of Jabril Harper: Hobbs Act conspiracy (Count 1); Hobbs Act robbery and extortion (Count 2); kidnapping (Count 3); and use, brandishing, and discharge of a firearm (Count 5). Green, Black, Rodriguez, and Coronado were also charged with discharge of a firearm causing death (Count 4). Finally, the indictment charged Green and Black with the following in relation to the kidnapping of Morris Singer in January of 2010: Hobbs Act conspiracy (Count 6); Hobbs Act robbery and extortion (Count 7); kidnapping (Count 8); and possession and brandishing of a firearm (Count 9). The indictment was filed just days before the statute of limitations was set to run

on certain charges related to Morris Singer and made Green, Black, and Rodriguez eligible for the death penalty.[1]

On January 13, 2015—two years and ten months after notifying the court that the government was considering seeking the death penalty—the government informed the parties and the court that it would not seek the death penalty against any defendant.

During arraignment proceedings for Green, Black, Rodriguez, and Ramos on the superseding indictment, Green expressed his frustration with the age of the case:

> I mean, I [would] rather represent myself. Like this is unconstitutional. I don't feel like this is right. I feel like counsel is ineffective. This whole proceeding, like it's a five year . . . statute of limitation[s] on the Hobbs Act. I'm very abreast with the law. This whole proceeding seem[s] illegal and it's like it's nothing being happening, like it's no bail.
> I've been incarcerated five years[2] and then come up with this superseding indictment. Like I don't understand it and everybody—

---

[1] The government explains that it could not bring the additional charges until it secured the cooperation of Antoine Callahan, who pled guilty on February 14, 2014. We note that the government had secured Callahan's cooperation ten months prior to filing the superseding indictment.

[2] At the time of Green's statement, he had in fact been detained on federal charges for just under three years.

14

I mean, we put in for a speedy trial. We don't want to file no motions.

Gov't App'x at 229. Thereafter, the court held a hearing on February 3, 2015, to address Green's concerns and evaluate his relationship with counsel. The court relieved Green's counsel at the hearing and appointed new counsel two weeks later.

## A. Pre-Trial Matters on the Superseding Indictment

On March 30, 2015, pre-trial briefing began anew with a motion from Green. Black and Rodriguez requested extensions, which the court granted, extending the deadline to file motions to May 1, 2015. The parties participated in three evidentiary hearings in June and July, and the court ordered post-hearing briefing due by September 28, 2015. After Black sought an extension of that due date, the court extended the deadline for all defendants' briefing to October 9, 2015. Green timely filed his briefing. Black and Rodriguez twice requested additional time, which caused a twenty-six-day delay. This was insufficient for Black, who requested even more additional time and ultimately filed his post-hearing brief on January 20, 2016.

Before the magistrate judge could consider the briefing, however, it needed to address several conflict-of-interest motions concerning Green, Ramos, and Coronado, which were not resolved until June 8, 2016.

Less than one month later on July 6, 2016, the magistrate judge issued a report and recommendation on the pre-trial motions. Upon a motion by Rodriguez, the court granted Defendant-Appellees a forty-three-day extension to file objections to the report and recommendation. Black and Rodriguez requested and received an additional four-week extension for filing objections until September 30, 2016. Green did not join in this request and timely filed his objections on September 2, 2016.[3] Black and Rodriguez then requested an additional extension of time because they were being held far outside the district and their counsel were encountering difficulty consulting with them. The court accommodated the request, making objections due on November 30, 2016. But Black and Rodriguez, again citing in part counsel-access issues, requested an additional extension of time to file objections until January 30, 2017, which was

---

[3] On September 23, 2016, counsel for Green died. Green was appointed replacement counsel six days later, without occasioning delay.

16

granted. Black and Rodriguez requested one last extension for their objections, and the court ordered their objections to be filed by March 1, 2017. Despite requesting an extension, Rodriguez filed his objections on January 30. Black filed his objections on February 27. After receiving a nine-day extension to file its response, the government responded to Defendants-Appellees' objections on March 29.

On April 26, 2017, the court resolved the parties' objections to the magistrate judge's report and recommendation. At a May 25, 2017, status conference, Green again objected to the delay in the proceedings, and the district court set trial for October 31, 2017.

**B. Motion to Dismiss and Trial**

Prior to trial, Defendants-Appellees moved to dismiss the superseding indictment on speedy trial grounds. The motion was fully briefed before the jury reached a verdict.

On November 7, 2017, the jury was sworn in and opening statements began. There were numerous delays during the trial, occasioned by attorney illnesses, late-breaking evidentiary disclosures, and several prolonged,

17

unexplained delays. Thus, the jury did not begin deliberating until January 5, 2018, almost two months later. On January 17, the jury returned a partial verdict that acquitted Green and Black of Counts 6-9—the charges related to the Singer kidnapping. On January 18, 2018, the jury hung on the remaining counts (Counts 1-5) related to the Harper murder.

By opinion dated February 8, 2018, the district court granted Defendants-Appellees' motion to dismiss Counts 1-5 (the Harper counts) on speedy trial grounds. *United States v. Green*, No. 12-CR-83S (1)(2)(3), 2018 WL 786185, at *1 (W.D.N.Y. Feb. 8, 2018). The district court denied reconsideration on February 20, 2018. The government timely appealed.

## DISCUSSION

The Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The right to a speedy trial has been deemed "fundamental" to our system of justice since its inception. *Klopfer v. North Carolina*, 386 U.S. 213, 223-26 (1967) ("The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution."). Pursuant to the Sixth Amendment,

18

the court and the government owe an "affirmative obligation" to criminal defendants and to the public to bring matters to trial promptly. *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir. 1979). This burden weighs particularly heavily on the government, which "owe[s] the additional duty of monitoring the case and pressing the court for a reasonably prompt trial." *United States v. Vispi*, 545 F.2d 328, 334 (2d Cir. 1976).

The right to a speedy trial primarily protects three interests of criminal defendants: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. 514, 532 (1972); *United States v. Ewell*, 383 U.S. 116, 120 (1966) ("This guarantee is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself."). In addition, the right to a speedy trial serves a societal interest in the fair and efficient operation of the criminal justice system and in limiting the costs to the

19

community of pretrial detention and its deleterious effects. *Barker*, 407 U.S. at 519-21.

Noting that "[i]t is . . . impossible to determine with precision when the right has been denied," the Supreme Court shaped the now-familiar inquiry for whether a defendant's right to a speedy trial has been violated in *Barker v. Wingo*. *Id*. at 521. We consider four factors: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. The Supreme Court emphasized in *Barker* that any individual factor cannot be a "necessary or sufficient condition" for a speedy trial violation but instead the factors are "related" and "must be considered together" in the context of the case. *Id.* at 533. Because we agree with the district court that the balanced factors reveal a speedy trial violation, we affirm the district court's dismissal of the remaining charges against Black, Green, and Rodriguez.

I.    **Standard of Review**

We review the dismissal of an indictment for a violation of the Sixth Amendment's guarantee of a speedy trial for abuse of discretion, *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015), though we have indicated that the abuse-

of-discretion standard authorizes broad review of a district court's balancing of the *Barker* factors, *United States v. Ghailani*, 733 F.3d 29, 44 (2d Cir. 2013) ("[I]n evaluating a defendant's rights under the Speedy Trial Clause, a district court is in no better position than a reviewing court to undertake the required balancing."). We review the district court's factual findings for clear error. *See Moreno*, 789 F.3d at 78.

## II. The Length of Delay Is Presumptively Prejudicial

The first factor, the length of delay, serves as a "triggering mechanism" that places a speedy trial violation on the table and requires us to balance the other factors. *Barker*, 407 U.S. at 530. Once a defendant demonstrates a "presumptively prejudicial delay" based on "the interval between accusation and trial," then we can consider the reason for the delay, the assertion of the right, and prejudice. *Ghailani*, 733 F.3d at 43 (internal quotation marks omitted). Where a defendant establishes a particularly substantial delay, "the burden is upon the government to prove that the delay was justified and that [the defendant's] speedy trial rights were not violated." *New Buffalo Amusement Corp.*, 600 F.2d at 377.

Whether a delay is presumptively prejudicial "is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31. Nonetheless, the Supreme Court has noted that a post-accusation delay approaching one year may be considered presumptively prejudicial, *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992), and that a delay of "well over five years [] was extraordinary," *Barker*, 407 U.S. at 533. This Court has held that a delay of "four and one-half years is unquestionably substantial," *New Buffalo Amusement Corp.*, 600 F.2d at 377, and has stated that a delay of nearly seven years is "extreme," *Tigano*, 880 F.3d at 612.

Defendants-Appellees waited nearly five years and eight months to stand trial. The delay exceeds the "extraordinary" delay of over five years in *Barker* and the "unquestionably substantial" delay of four and one-half years in *New Buffalo Amusement Corp. See Barker*, 407 U.S. at 533; *New Buffalo Amusement Corp.*, 600 F.2d at 377. In fact, the government has conceded that the delay in this case was presumptively prejudicial, and the circumstances of the case affirm the propriety of that concession. While the present case evolved from a single-count indictment against three defendants to a nine-count indictment against five

22

defendants, the myriad delays here did not arise from any unique complexities in the case, and there is no suggestion that a case of this nature would require sixty-eight months of pre-trial litigation. We therefore easily find that the delay of five years and eight months in this case is substantial and presumptively prejudicial.

Our dissenting colleague, however, would hold that the delay in this case as to Counts 2 to 5 was substantially shorter than sixty-eight months and was not presumptively prejudicial. The dissent urges that the district court improperly calculated the length of delay by measuring the delay for *all* charges (that is, for both the charge in the original indictment and the additional charges in the superseding indictment) as the period between when Black, Green, and Rodriguez were first indicted and when they were tried. The district court's measure will not do for our dissenting colleague, who concludes that the time for measuring Defendants-Appellees' constitutional speedy trial claims as to Counts 2 to 5 starts with the date of the superseding indictment. Drawing upon double jeopardy jurisprudence from *Blockburger v. United States*, 284 U.S. 299 (1932), the dissent would hold that each charge brought on a superseding indictment that

23

requires proof of a different element than the charges in the original indictment marks the beginning of the period for assessing Defendants-Appellees' constitutional speedy trial claim for that charge. The dissent would therefore find that the district court erred in dismissing Counts 2 to 5.

We decline to adopt the dissent's view for three primary reasons. First, the government forfeited this argument by not raising it below or even in its briefs to this Court. Second, the dissent's advocacy for a *Blockburger*-type analysis rests on the flawed premise that the Sixth Amendment right to a speedy trial attaches only after formal charges are filed and thus that it is possible for the relevant time period for a speedy trial claim to attach separately to each charge that a defendant faces. And finally, we are convinced that importing *Blockburger* to determine when the relevant time period for a speedy trial claim begins to run on charges brought on superseding indictments would vitiate the bedrock purposes of the Sixth Amendment.

As a preliminary matter, were it not for the dissent, we would not here consider whether the superseding indictment marked the start of the relevant speedy trial time period for Counts 2 to 5 because the government did not

24

argue—or even suggest—that the December 2014 indictment was the relevant trigger for Defendants-Appellees' speedy trial calculation for Counts 2 to 5. Instead, the government accepted the district court's timeframe and argued that the district court erred in allocating the responsibility for the delay between the parties and in finding that Defendants-Appellees had regularly asserted their rights to a speedy trial. "It is well established that an argument not raised on appeal is deemed abandoned, and we will not ordinarily consider such an argument unless manifest injustice otherwise would result." *United States v. Quiroz*, 22 F.3d 489, 490-91 (2d Cir. 1994) (citations omitted) (internal quotation marks omitted).

No manifest injustice would inure from deciding this case on the terms the government presented to us. This is the third speedy trial case the United States Attorney for the Western District of New York has argued before us in the last two years. *Tigano*, 880 F.3d 602; *Pennick*, 713 F. App'x 33. Given the familiarity with speedy trial cases in the United States Attorney's Office in the Western District of New York, we conclude the government's failure to raise this argument was most likely a strategic decision. But for the dissent, we would

25

decline to save Appellant from its own choices. We thus do not perceive manifest injustice as a consequence of our refusal to entertain an argument that we should revolutionize Sixth Amendment speedy trial jurisprudence by shifting the trigger of the relevant time period for a speedy trial.

More importantly, we disagree with the dissent's predicate conclusion that the Sixth Amendment is triggered only by formal charges and is therefore compatible with double-jeopardy jurisprudence. The dissent uses right-to-counsel jurisprudence to justify a traverse to the Fifth Amendment in adjudicating a speedy trial claim, but the right to counsel is fundamentally distinct from the right to a speedy trial. Binding precedent establishes that the right to a speedy trial can attach before any formal charge is filed, and we therefore conclude it would be inappropriate to assign each charge against Defendants-Appellees its own time period for a speedy trial based on the time of indictment.

The right to counsel and the right to a speedy trial attach at different points in a defendant's journey through the criminal justice system. The right to counsel engages "at or after the time that judicial proceedings have been initiated against

him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (internal quotation marks omitted); *see also Rothgery v. Gillespie County*, 554 U.S. 191, 194 (2008) ("[T]he right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty."). The right to a speedy trial, in contrast, is engaged by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion*, 404 U.S. 307, 320 (1971). As a consequence, unlike the right to counsel, the right to a speedy trial attaches at arrest—not when formal charges are filed. *Dillingham v. United States*, 423 U.S. 64, 65 (1975).

In *Dillingham*, the Supreme Court reversed the Fifth Circuit when it calculated the speedy trial delay from the date the indictment was filed and thereby failed to account for the twenty-two months between the defendant's arrest and the indictment. *Id.* at 64-65. The Supreme Court concluded that accounting was contrary to its precedent, which counseled, "Invocation of the

speedy trial provision . . . need not await indictment, information, or other formal charge." *Id.* at 65 (internal quotation marks omitted) (quoting *Marion*, 404 U.S. at 321). The Court made the relevance of arrest emphatically clear: "[T]he Government constituted petitioner an 'accused' when it *arrested* him and thereby commenced its prosecution of him."[4] *Id*. at 65 (emphasis added).

---

[4] The full passage in which this sentence appears elaborates the point:

> The Court of Appeals for the Fifth Circuit affirmed, holding that under *United States v. Marion*, 404 U.S. 307 (1971), the 22-month "pre-indictment delay . . . is not to be counted for the purposes of a Sixth Amendment motion absent a showing of actual prejudice." 502 F.2d 1233, 1235 (1974). This reading of *Marion* was incorrect. *Marion* presented the question whether in assessing a denial of speedy trial claim, there was to be counted a delay between the end of the criminal scheme charged and the indictment of a suspect not arrested or otherwise charged previous to the indictment. The Court held: "On its face, the protection of the (Sixth) Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time." 404 U.S. at 313. In contrast, *the Government constituted petitioner an "accused" when it arrested him and thereby commenced its prosecution of him*. *Marion* made this clear, *id.* at 320-21, where the Court stated:
>> "To legally arrest and detain, the Government must assert probable cause to believe the arrestee has

In *United States v. MacDonald*,[5] the Supreme Court again made it clear that when a defendant is arrested, a criminal prosecution has begun, and a defendant's speedy trial right attaches. 456 U.S. 1, 7 (1982). The Court noted that while "[a] *literal* reading of the [Sixth] Amendment suggests that this right

> committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These considerations were substantial underpinnings for the decision in *Klopfer v. North Carolina* [386 U.S. 213 (1967)]; *see also Smith v. Hooey*, 393 U.S. 374, 377-78 (1969). So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.
>     *"Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge."*

*Dillingham*, 423 U.S. at 64-65 (alterations in original) (emphases added) (citations edited) (quoting *Marion*, 404 U.S. at 313, 320-21).

[5] In *MacDonald*, the Supreme Court was presented with the question of whether the time between when military charges were filed and when a later indictment containing civil criminal charges was filed based on the same conduct counted toward speedy trial delay. 456 U.S. 1, 3 (1982). The Court held that it did not. *Id.* at 9-10.

attaches only when a formal criminal charge is instituted and a criminal prosecution begins," the right to a speedy trial properly attaches after the government has "legally arrest[ed] and detained" the defendant—in which case, a criminal prosecution implicating a defendant's Sixth Amendment right to a speedy trial has begun. *Id.* at 6, 8 (emphasis added) (internal quotation marks omitted). That is true because "the speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial . . . [and] shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *Id.* at 8. Therefore, the Court reasoned, "[i]n addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim." *Id.* at 7.

The Supreme Court has, in fact, repeatedly instructed that courts are required to count the time between a defendant's arrest and the filing of an indictment in the duration of the relevant speedy trial time period. In *Doggett*, the Court said, "Once triggered by *arrest*, indictment, or other official accusation, . . . the speedy trial enquiry must weigh the effect of delay on the accused's defense just as it has to weigh any other form of prejudice that *Barker*

30

recognized." 505 U.S. at 655 (emphasis added). And in *Betterman v. Montana*, the Court held "that the [Sixth Amendment speedy trial] guarantee protects the accused from *arrest* or indictment through trial . . . ." 136 S. Ct. 1609, 1612 (2016) (emphasis added). The Supreme Court has therefore left little doubt that the right to a speedy trial is not mechanistically linked to the filing of formal charges but instead attaches at arrest.

The difference between the points at which the right to counsel and the right to a speedy trial attach reflects the substantive differences between the two Sixth Amendment protections. The Supreme Court has made it clear that "the right to counsel exists to protect the accused during trial-type confrontations," while "the speedy trial right exists primarily to protect an individual's liberty interest." *United States v. Gouveia*, 467 U.S. 180, 190 (1984). Since a criminal defendant's liberty interest is jeopardized by an arrest even prior to the defendant facing an indictment, the speedy trial right must attach in some cases before formal charges are filed. *See MacDonald*, 456 U.S. at 7.

Deployment of the *Blockburger* test, however, is only viable if the right to a speedy trial triggers at the time formal charges are filed. To apply the *Blockburger*

31

test to speedy trial claims with superseding indictments, a court would need to compare two or more indictments and determine whether the superseding indictment brought new charges that required additional elements to be proven in order to determine the duration of the relevant period of delay. To do so would require us to ignore the fact that a defendant's liberty interests had been compromised since the original indictment was filed. Giving each charge its own relevant time period for assessing delay could subject a criminal defendant to nearly ceaseless pre-trial detention due to superseding indictments, each time justified by a new charge with a new element. Instead of condoning this troubling consequence, we conclude that the mechanistic inquiry that *Blockburger* requires is at odds with the "amorphous" right to a speedy trial, the scope of which is attuned to the facts of each case rather than just to the charges the government brings. *See Barker*, 407 U.S. at 522, 531-32.

Third and finally, we disagree with the dissent because we conclude that the application of a *Blockburger* test to speedy trial cases with superseding indictments would vitiate the important interests that the Speedy Trial Clause protects. As we have noted, the Sixth Amendment protects defendants against

32

"oppressive pretrial incarceration," seeks to minimize the accused's "anxiety and concern" in the face of criminal charges, and "limit[s] the possibility that the defense will be impaired." *Id*. at 532. But if we allowed the government to use an indictment as a placeholder while contemplating more severe charges based on the same conduct, as it did here, those protections would fall. For example, if we marked the beginning of the relevant period of delay in this case for all charges other than Hobbs Act conspiracy at the time of the second indictment, we would ignore the two years and nine months prior that Defendants-Appellees had been actually restrained, *cf. United States v. Sorrentino*, 72 F.3d 294, 297 (2d Cir. 1995) (determining whether the appellant was either arrested or subjected to substantial restrictions for purposes of answering a criminal charge), *overruled in part on other grounds by United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008). Thus, not only does the Supreme Court's instruction to count "the period between arrest and indictment" make such an accounting impermissible, *MacDonald*, 456 U.S. at 7, the practical application of this principle would require us to turn a blind eye to years of pre-trial incarceration that ultimately became oppressive.

No more easily could we ignore that the accused persons' anxiety and concern regarding the charges and their potential consequences persisted from the filing of the first indictment until the jury declined to convict Defendants-Appellees. Such anxiety was only increased, not initiated, when the government filed a superseding indictment. Lastly, where charges on a superseding indictment arise from the same conduct as the original indictment, allowing the superseding indictment to start a new relevant speedy trial time period for certain charges would only exacerbate our concerns about aging evidence. Witnesses' memories and availability are preciously limited, and adopting a framework that permits the government to indict by placeholder and prolong the time between the wrongful act and trial fails to fiercely guard a defendant's access to unimpaired evidence.

We therefore hold that the relevant interval for Defendants-Appellees' Sixth Amendment speedy trial claim is from the *first* indictment or arrest to trial. In so doing, we, like six of our sister circuits, do not apply the dissent's suggested *Blockburger* approach to calculate the relevant delay for a speedy trial violation where a superseding indictment is filed. *See United States v. Handa*, 892 F.3d 95,

106-07 (1st Cir. 2018) (measuring duration of delay from the first indictment where charges in the superseding indictment arose from the same occurrence and the government reasonably could have brought all charges at once); *United States v. Battis*, 589 F.3d 673, 679 & n.5 (3d Cir. 2009) (calculating delay as the period "between the [first] federal indictment . . . and the start of trial," and holding "that the speedy trial right was not affected by the filing of a superseding indictment"); *United States v. Oriedo*, 498 F.3d 593, 595, 597 (7th Cir. 2007) (finding presumptive prejudice where "nearly three years passed from original indictment to trial" in a case with four superseding indictments); *United States v. Milhim*, 702 F.2d 522, 524-25 (5th Cir. 1983) (starting speedy trial time period upon filing of original indictment despite superseding indictment being filed four months later); *see also United States v. Black*, 830 F.3d 1099, 1103–09, 1112 (10th Cir. 2016) (calculating speedy trial delay where parties agreed on length of delay by combining "the three periods during which an indictment was pending against Black"); *United States v. Jeanetta*, 533 F.3d 651, 653-54, 656 (8th Cir. 2008) (counting, without discussion, delay from original indictment until trial despite superseding indictment nine months after original indictment).

## III. Significant Delay Is Attributable to the Government

The second factor, the reason for the delay in bringing the defendant to trial, asks us to consider whether the delay was deliberate, neutral, or valid. *Barker*, 407 U.S. at 531. Even where the delay at issue is neutral, we must determine who bears responsibility for the delay. *E.g.*, *New Buffalo Amusement Corp.*, 600 F.2d at 377-78 (considering whether the government or defendants were responsible for numerous delays); *see also, e.g.*, *Tigano*, 880 F.3d at 613 (engaging in similar analysis). Nonetheless, we routinely count neutral delay "such as negligence or overcrowded courts" against the government because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531; *see also Vispi*, 545 F.2d at 334 ("We have repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated and that it cannot escape this duty on the ground that the delay is for institutional reasons."). Thus, "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution

36

once it has begun." *Doggett*, 505 U.S. at 657. "[O]ur toleration of such negligence varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial." *Id.* (citation omitted).

The district court concluded that there was no evidence of deliberate delay but there was significant neutral delay. The court also considered some delay to be valid given the complexity of the case. We agree with the district court that much of the delay in this case was neutral but properly charged to the government. The neutral delay we charge to the government largely emanates from: (1) the government's delayed decision on whether to seek the death penalty; (2) protracted litigation over missing evidence; (3) the government's decision to file the superseding indictment just before the statute of limitations on certain charges was set to run; and (4) the government's failure to produce witnesses and Defendants-Appellees at court proceedings. Defendants-Appellees, particularly Black and Rodriguez, are also charged with some delay from filing objections to the magistrate judge's report and recommendation, though some of this delay is tempered by the fact that attorney–client access issues occasioned it.

**A. Delay from the Government's Death-Penalty Decision**

The government informed the court that the prosecution might seek the death penalty as early as March 7, 2012. The district court concluded that despite the prominence of a possible death sentence in the pre-trial proceedings, the government took no action for over two years to decide whether to pursue the death penalty. The government urges us to overturn this conclusion, but it has not provided any indication that it took more action on the issue than the district court gave it credit for. Indeed, while we understand that whether to seek the death penalty is a complex and appropriately deliberative process, the government has not explained why this particular deliberation lasted nearly three years.

The government urges that its deliberations were not the source of delay in this case but instead that, prior to the superseding indictment, the parties were prepared to proceed as if the death penalty were not on the table. The parties may have been prepared to proceed on the single-charge indictment as of December 2012, but the death-penalty decision was explicitly noted as the reason for numerous extensions in the early months of the case. From April 2012 until

December 2012 (when it became clear that the prosecutor's predictions as to when the government would receive a death-penalty determination were woefully inaccurate), Defendants-Appellees repeatedly sought extensions to avoid filing motions that would be substantively useless if the prosecution sought the death penalty. Even the magistrate judge explicitly recognized that the government's death-penalty deliberations were the driving force behind the extensions. Gov't App'x at 157 (after vacating briefing schedule due to pending death-penalty decision, setting the schedule "to accommodate what is now some 60-day timeline"). And even still, the progress made in prosecuting the original indictment was substantially compromised by the late-breaking superseding indictment, which required new rounds of motion practice. The government's attempts to minimize its responsibility for the delay are unavailing.

While we agree that the looming death-penalty decision cannot properly charge the government with the entirety of the two years and ten months of delay before the government filed notice of its intent not to seek the death penalty, the government bears the burden of the delay between April 2012 and December 2012 occasioned by the death-penalty decision and can properly be

39

credited with some delay produced by the continuing threat that the proceedings would ultimately turn capital and nullify the work done to date.

**B. Delay Arising from Litigation over Missing Photo Arrays**

The district court also attributed about five months of delay to the government for its failure to efficiently manage its case, arising largely from protracted litigation about photo arrays that were used to identify Defendants-Appellees and had gone missing. Beginning in December 2012 and continuing until the last of the missing arrays was found in April of 2014, the photo arrays were a central focus of pre-trial litigation, and the photo array used to identify Rodriguez alone accounted for at least five months of delay between February and June of 2014.

We find this failure particularly egregious. The government lost a piece of evidence for over two years after the indictment was filed, only for the array to be found in the home of a retired Buffalo police detective who was not even involved in police identification efforts. We find no difficulty in attributing to the government a five-month delay based on the time spent litigating the photo

arrays and the government's failure to produce key evidence and witnesses related to the photo arrays.

## C. Delay Occasioned by the Late-Breaking Superseding Indictment

The government's decision to file a superseding indictment just as the statute of limitations was about to run on some charges and two years and nine months after it filed the original indictment created significant additional delay.[6] Effectively, between March of 2012 and January of 2015, Defendants-Appellees were waiting to find out what type of case this would become: for almost three years it was unclear what the ultimate charges against Defendants-Appellees would be and whether the government would pursue the death penalty. Once the dust settled, much of the pre-trial litigation prior to the superseding indictment needed to be restarted because the superseding indictment added

---

[6] The dissent would also exclude the government's "investigative delay" in bringing the superseding indictment. While we concur that it is good practice for a prosecutor to wait to bring a superseding indictment until she is satisfied that a suspect can be shown to be guilty beyond a reasonable doubt, the dissent offers no reason that this investigative delay is not properly counted as neutral delay attributed to the government for purposes of the Speedy Trial Clause. *See Barker*, 407 U.S. at 531 (noting that a "neutral reason" for delay "should be weighted less heavily but nevertheless should be considered").

41

new charges related to the conduct that Defendants-Appellees were already defending against, brought charges regarding completely unrelated conduct, and made Defendants-Appellees eligible for a death sentence.[7] While some of the delay in litigating pre-trial issues anew is attributable to Defendants-Appellees' requests for extensions, the fact that there was a new round of pre-trial litigation *at all* is attributable to the government's poor case management.

### D. Delay from the Government's Failure to Produce Defendants-Appellees and Witnesses and Extension Requests

The government's total delay must also recognize smaller "neglects" that nonetheless extended the case. *Tigano*, 880 F.3d at 606. Most significantly, the government brought proceedings to a standstill between October 2, 2013, and December 3, 2013. During that time, the government requested a postponement of an evidentiary hearing—from October 2 to November 6—to accommodate the prosecutors' other commitments (thirty-five days of delay). But on November 6, when the hearing was to go forward, the prosecution did not produce a key

_____

[7] We of course acknowledge that the government finally issued its "no-seek" decision approximately one month after it filed the superseding indictment. Nonetheless, the new charges meant that Defendants-Appellees faced a life sentence.

42

witness, causing another twenty-seven-day delay. On the rescheduled date for the evidentiary hearing, the government failed to produce Black (resulting in a seventeen-day delay). At the parties' next attempt to hold a hearing, the government again failed to produce Black, and after that misstep, the hearing did not go forward for another sixty-one days. All told, the delay in holding this single evidentiary hearing totaled almost five months. Added to the government's extension requests and other failures to produce Defendants-Appellees, these small delays amount to five-and-a-half months of delay attributable to the government.

**E.  Delays Accrued from Defendants-Appellees' Extension Requests**

Defendants-Appellees also shoulder the blame for some of the five years and eight months between when the original indictment was filed and the start of trial. Two delays in Defendants-Appellees' filings are particularly noteworthy here. First, Defendants-Appellees significantly delayed post–evidentiary-hearing briefing in the fall of 2015. Submissions were originally due by September 28, 2015, but Defendants-Appellees sought and received a ten-day extension to file. Green timely filed his post-hearing brief, but Black and Rodriguez sought and

43

received a two-week extension. Upon Rodriguez's motion, the magistrate judge granted Black and Rodriguez another two-week extension. Black and Rodriguez sought and received yet another extension of the post-hearing briefing deadline, this time postponing the due date by sixty-four days. Rodriguez then filed his post-hearing submission, but Black did not file his submission until January 20, 2016—a full thirteen days after the deadline. Thus, while Green caused a brief, ten-day delay, Black and Rodriguez were significantly more dilatory.

Defendants-Appellees also requested numerous extensions to file objections to the magistrate judge's report and recommendation. Black, Green, and Rodriguez all requested a forty-four-day extension for submitting their objections, and thereafter Green timely filed. Black and Rodriguez, however, each received twenty-eight extra days to file their objections due to their attorneys' scheduling conflicts. Thereafter, Black and Rodriguez requested an additional sixty-day extension, citing attorney–client access issues caused by Black and Rodriguez being held outside the district. As that extension expired, they sought and received a second sixty-day extension, again in part due to attorney–client access issues. Rodriguez and Black also sought one final

44

extension of thirty days, which Rodriguez ultimately did not use. While we count these delays against Black and Rodriguez, we attribute little weight to delays that Defendants-Appellees incurred due to institutional considerations, such as Black and Rodriguez being held in distant federal facilities. *See Tigano*, 880 F.3d at 612-13 (noting the "spectrum of weights" to be applied to different delays).

**F. The Government Is Responsible for Significant Delay**

In sum, we agree with the district court that a significant portion of the delay is attributable to the government. The government bungled its production of documents used in identification procedures, failed to produce Defendants-Appellees and witnesses, and poorly managed the case against Defendants-Appellees. Significantly, the government's inaction and subsequent indecision over whether to seek the death penalty loomed over the case for two years and ten months, and just when the case was nearly ready for trial, the government superseded the indictment, effectively scrubbing two years and nine months of belabored pre-trial litigation.

45

## IV. Defendants-Appellees Regularly Asserted Their Rights to a Speedy Trial

On the third *Barker* factor, we consider Defendants-Appellees' assertions of their rights to a speedy trial. *Barker*, 407 U.S. at 531-32. This inquiry is closely related to the other three inquiries—we expect a defendant's assertion of his right to a speedy trial "will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Id.* at 531. We have previously noted that this inquiry is a fluid one that concerns itself with whether the government and the court were "put on notice" that a defendant has asserted his right to a speedy trial. *New Buffalo Amusement Corp.*, 600 F.2d at 378; *see also Tigano*, 880 F.3d at 617-18.

The district court concluded that Defendants-Appellees frequently expressed their desire for a speedy trial. We agree. Defendants-Appellees first raised their preference to "mov[e] the case along to the extent possible" in August of 2012 at a status conference held to determine how best to proceed in the absence of the promised superseding indictment. Gov't App'x at 156-57. Defendants-Appellees again asserted their desire for a speedy trial and voiced

46

their concerns that a delayed death-penalty decision might interfere with a speedy trial at a status conference on December 4, 2012. In the midst of protracted litigation over the photo arrays, Defendants-Appellees for a third time, on April 18, 2014, noted that they were preserving their right to a speedy trial. On January 21, 2015, when Defendants-Appellees were arraigned on the superseding indictment, Green raised his concerns about the age of the case directly with the court. Speaking for himself, Green stated, "This whole proceeding seem[s] illegal and it's like it's nothing being happening, like it's no bail. I've been incarcerated five years and then come up with this superseding indictment . . . . [W]e put in for a speedy trial." Gov't App'x at 229. He reiterated, "We scheduled for a trial after 71 days, that's what we want a speedy trial, all three of us, we [are] all in concurrence with that . . . ." Gov't App'x at 229. The court ultimately even held a separate conference with Green to discuss the issue and Green's relationship with his attorney. Defendants-Appellees' invocation of the right continued over the next two years, as they raised concerns with pre-trial delay on June 3, 2015, and Green objected to the delay of trial yet again at a May 25, 2017, status conference.

These assertions, standing on their own, undoubtedly put the government on notice that there would be consequences if Defendants-Appellees' speedy trial rights were not protected. *Tigano*, 880 F.3d at 617. While the government on appeal makes much of the district court's references to Defendants-Appellees' motions for severance, we find the aforementioned assertions of their speedy trial rights sufficient to preserve the right even absent consideration of the severance motions. The fact that Defendants-Appellees also sought severance does not affect our analysis of the direct assertions of their rights. Thus, since Defendants-Appellees raised speedy trial concerns frequently and explicitly, we conclude that they have satisfied their obligation to preserve their right, and this factor weighs in their favor.

## V. The Delay Was Prejudicial to Defendants-Appellees

We assess the prejudice to criminal defendants "in the light of the interests . . . the speedy trial right was designed to protect"—namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. While prejudice to the defense is "the most serious" of

these interests, we also consider the "dead time" defendants spend in pre-trial detention, the effect of detention on a defendant's ability to "prepare his defense," and the detrimental effect of "living under a cloud of anxiety, suspicion, and often hostility." *Id.* at 532-33. "Affirmative proof of impairment of the defense is not required in order to find a Sixth Amendment violation." *Tigano*, 880 F.3d at 618; *see also Doggett*, 505 U.S. at 655 ("[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim."). To the contrary, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655.

We agree with the district court that a significant portion of the prejudice in this case arises from the government's delayed death-penalty decision. In addition to the psychological effects of pre-trial custody, Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration

49

weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.

The prejudice against Defendants-Appellees did not end there, however. Indeed, they were forced to endure five years and eight months of pre-trial detention, time that the Supreme Court has noted "is simply dead time." *Barker*, 407 U.S. at 533. The sheer length of time at issue here makes this pre-trial detention "egregiously oppressive." *Tigano*, 880 F.3d at 618.

We recognize that this consideration weighs less strongly in favor of Black, who was already in state custody serving a lengthy sentence when he was charged in this case. Black nonetheless argues that he was prejudiced by the extensive pre-trial detention because if the case had proceeded more quickly, he could have served his state sentence concurrently with his federal sentence. Although Black is correct that "[j]udges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings," *Setser v. United States*, 566 U.S. 231, 236 (2012), we need not hazard a guess as to whether the

district court would have imposed a concurrent sentence on Black in this case or whether Black was realistically concerned that a trial delay would shorten the portion of his state sentence to which a federal sentence could run concurrently in order to find that the delay prejudiced Black. This is because Black faced the oppressive weight of the death-penalty decision, making the lengthy pre-trial time served concurrently with his state sentence particularly harsh.

We are also cognizant that Defendants-Appellees have not obviously suffered prejudice to their defense—indeed, they were acquitted on the charges related to Morris Singer, and the jury hung on the charges related to Jabril Harper. However, the delay in this case did present obstacles for the defense to overcome. First, the government's decision to file a superseding indictment two years and nine months into the case forced Defendants-Appellees to restructure their defense strategy while living with the decisions they had made in litigating the one-count indictment for years. Thus, facing a drastically changed case against them, Defendants-Appellees' defense options were constrained by their prior choices in defending against a significantly lighter indictment. Second, particularly later in the pre-trial detention, Black and Rodriguez were housed far

from their counsel,[8] making it difficult for them to file objections to the

magistrate's report and recommendation and prolonging their already

extraordinary detention. As such, we recognize that prejudice to building a

meritorious defense was modest, but the consequences of an extensive delay

between indictment and trial nonetheless exacerbated the anxiety of the accused

and impacted the defense.

## VI.     The Factors Balance in Favor of Dismissal on Speedy Trial Grounds

Bearing heavily in mind the sheer length of the time between indictment

and trial, the neglected death-penalty decision, and the tardy superseding

indictment, we conclude that the district court correctly dismissed the remaining

counts on speedy trial grounds. The government bears responsibility for making

---

[8] While Black would have been detained in state custody if not for this case, because he was placed in federal custody for a portion of the pretrial proceedings, he was housed in the Northeast Ohio Correctional Center. Motion for an Extension of Time at 3, *United States v. Green*, No. 1:12-cr-83 (W.D.N.Y.), ECF No. 326; Motion for an Extension of Time at 3, *Green*, No. 1:12-cr-83, ECF No. 351. He had originally been serving his state sentence in Coxsackie, New York. Petition & Order for Writ of Habeas Corpus Ad Prosequendum at 1, *Green*, No. 1:12-cr-83, ECF No. 2. Thus, these attorney-access issues were a unique feature of Black's time in federal custody.

no effort to resolve the death-penalty question for two years, for waiting until the eve of the expiration of the statute of limitations to file a superseding indictment, for losing key evidence, and for repeatedly failing to produce Defendants-Appellees at court proceedings. Defendants-Appellees' requests for scheduling accommodations pale in comparison to these delays. Defendants-Appellees made known their desire to proceed expediently to trial throughout the litigation, but these repeated requests failed to spur the government into upholding its "affirmative duty" to bring the case to trial without "unnecessary delay." *Tigano*, 880 F.3d at 613. And while Defendants-Appellees successfully avoided a guilty verdict in this case, they did so at the cost of five years and eight months of incarceration and at the psychological expense of uncertainty over whether they would face the death penalty for two years and ten months. Defendants-Appellees' rights to a speedy trial were violated and dismissal is appropriate.

## CONCLUSION

Our holding today reiterates the affirmative obligation of both the court and the government to bring criminal defendants to trial promptly. *New Buffalo*

*Amusement Corp.*, 600 F.2d at 377. The court and government here made Black, Green, and Rodriguez await trial for five years and eight months. For two years and ten months of that extraordinary time, the government dangled the prospect of a capital prosecution. The Sixth Amendment right to a speedy trial requires significantly more vigilance from the court and the government than was demonstrated here. Accordingly, for the reasons given above, the judgment of the district court is **AFFIRMED**.[9]

---

[9] The grounds for the cross-appeals by Green and Rodriguez were rejected by this Court's order of May 16, 2018, denying Green's request for immediate pre-trial release without conditions and Rodriguez's request for less restrictive conditions of release. No. 18-574, ECF No. 39; No. 18-548, ECF No. 46. Accordingly, the cross-appeals, Nos. 18-574 and 18-548, are dismissed as moot.

DENISE COTE, District Judge, concurring in part in the judgment and dissenting in part:

The majority decides today that the Sixth Amendment's speedy trial right attaches at the time of initial arrest, not at the commencement of adversarial proceedings, and that the amount of delay in bringing a defendant to trial is measured for Sixth Amendment purposes from that date not only for the crime with which a defendant is initially charged but also for any charges that may be filed later and that arise out of the "same conduct" underlying that arrest. It also concludes that the time the government spent investigating the murder before filing a superseding indictment containing death-eligible counts constituted unreasonable delay and requires dismissal of the counts added in the superseding indictment despite the district court's finding that the government engaged in no intentional delay in its investigation. I respectfully dissent from the dismissal of the counts included for the first time in the superseding indictment.

Delaying a trial for almost six years after indictment is extraordinary and merits the most careful examination of the reasons for that delay and of whether the district court should have acted differently to enforce the Sixth Amendment's

1

Speedy Trial Clause.  As the majority appropriately observes, this is the third appeal to come before us in recent years in which there were unacceptable delays in scheduling criminal trials in the Western District of New York.  I have no quarrel, therefore, with this court expressing dismay over the length of delay, even in the absence of any showing of prejudice to a defendant's right to present a defense.  My dissent is prompted by concern about the legal framework the majority adopts to arrive at its decision affirming the district court's dismissal of all of the charges against the defendants.  I believe that that legal framework runs contrary to controlling Sixth Amendment jurisprudence and will improperly restrict the government's ability to investigate and prosecute criminal activity.

As set out below, Sixth Amendment rights do not attach at arrest; they attach when adversarial judicial proceedings are initiated, customarily through indictment, information, or a presentment on a criminal complaint.  This is true whether it is the Sixth Amendment right to counsel or the Sixth Amendment right to a speedy trial.  When a superseding indictment is filed that adds new charges, the Blockburger test determines whether the Sixth Amendment's speedy trial rights attach for those new charges at that time or at some earlier time, just as it does when the Sixth Amendment right to counsel is at stake.  This is true

2

whether or not the new charges arise out of the "same conduct" as the earlier-filed charges. If the government intentionally delays the filing of new charges, the Fifth Amendment's Due Process Clause provides a defendant with additional protections.

In this case, the defendants were indicted on March 6, 2012 with a single charge arising from a murder that occurred on December 16, 2009. Almost three years later, the government filed a superseding indictment adding four additional counts related to that murder, including two death-eligible counts, and three charges arising from an armed robbery that had occurred in January 2010. The defendants were tried on all charges roughly thirty-five months later; they were acquitted of the 2010 armed robbery charges; the jury hung on the five charges related to the 2009 murder. Neither the district court nor the majority concludes that there was any violation of the Speedy Trial Clause based solely on the interval of time between the filing of the superseding indictment and the trial. This appeal largely turns therefore on whether the majority is correct in concluding that all charges must be dismissed with prejudice because the five-year eight-month period between the initial indictment and the trial may properly be attributed not just to the charge in the initial indictment but also to

3

each of the charges brought for the first time through the superseding indictment.  I find it may not.

## **BACKGROUND**

On December 16, 2009, Buffalo police found the body of Jabril Harper in Roosevelt Park.  He had two gunshot wounds to his head.

On February 23, 2012, the government filed a criminal complaint charging Ernest Green with a single count of Hobbs Act Robbery in connection with the Harper murder.  At the time of the filing, Green was in state prison.  He was released to federal custody on February 24.  He made his initial appearance before a magistrate judge on March 5.

On March 6, 2012, a Grand Jury returned a single-count indictment charging Green, Rodshaun Black, and Daniel Rodriguez with Hobbs Act Conspiracy.  Over the next sixty-eight months, these three defendants were held in custody awaiting trial.[1]

---

[1] Black, who is serving a state sentence, shuttled back and forth between state custody and federal pretrial detention.

4

At a court appearance on March 7, 2012 -- the day after the initial indictment was filed -- the government informed the magistrate judge to whom this case was assigned for pretrial management:

> there is a possibility if not likelihood of additional charges down the road. I know that's not really to be considered by the Court right now, but in terms of appointment of counsel, it could be a death penalty eligible case, Judge. So, no decisions have been made in that regard obviously, no charges have been brought in that regard yet. But I would just urge the Court to appoint[] experienced counsel.

Gov't App'x at 102. In light of this statement, the magistrate judge appointed "learned" counsel to represent the defendants.[2]

In a letter to the magistrate judge dated April 17, 2012, defense counsel asked the court to "suspend its Scheduling Order concerning motions (dispositive and non-dispositive) until the government makes a decision" concerning its notice of intent to seek the death penalty. Id. at 116. Defense

---

[2] Pursuant to 18 U.S.C. § 3005, defendants who have been charged with crimes eligible for the imposition of the death penalty are entitled to appointment of a second attorney learned in death penalty jurisprudence. The Western District of New York's plan for criminal proceedings in which CJA counsel will be appointed requires that the court specifically inquire whether the government will be considering a future death-eligible charge if the underlying facts may permit such a subsequent filing. See Western District of New York Criminal Justice Act Plan 17 (Jun. 18, 2010), available at http://www.nywd.uscourts.gov/sites/nywd/files/CJA-2010-91%20Criminal%20Justice%20Act%20Plan%2C%206-18-10.pdf.

5

counsel argued that "[g]oing forward with the filing of motions at this time, only to have the government subsequently file a superseding indictment and issue its [notice of intent], will require a whole new set of motions and motion practice, impinging on judicial economy in addressing the pre-trial stage of this case." Id. at 117.

At a conference held on May 17, 2012, the government opposed that request, noting that it was difficult to predict when or if a superseding indictment would be filed. The government took the position that

> there is a . . . relatively simple pending case. It's a one-count Hobbs Act conspiracy. And I don't know that the motion schedule and the proceedings in this one-count fairly simple case should be held up . . . pending something . . . that's difficult to pin down.

Id. at 126. The government specifically noted that "speedy trial is certainly an issue and a concern," and that it was "more than ready and satisfied to proceed in this case with the schedule." Id. at 127. The magistrate judge expressed an unwillingness to adjourn the case generally to accommodate the timeline for reaching a decision on death-eligible charges, noting that he "had one similar experience where it went on for months, perhaps even more than a year." Id. at 129. Nevertheless, the magistrate judge extended the motion schedule for two months, making motions due July 28, 2012.

On July 24, 2012, the defendants moved for a further extension of time to file defense motions because the government had not yet come to a decision regarding death-eligible charges. A conference was held before the magistrate judge on August 2 to discuss the potential for a superseding indictment and the government's submissions to the Department of Justice regarding the death penalty. At that conference, the government stated:

> [W]e're informed, Judge, by main justice that it will be approximately a 60-day period or 60 days from the present to get [a decision on whether to issue a notice of intent to seek the death penalty]. Actually the normal protocol is 90 days. But we've been informed they believe we could get a decision in a 60-day period. As the Court is probably aware, the Attorney General ultimately makes that decision. So, we are looking, Judge, at taking us into the very beginning of October before having that decision.

Id. at 156. Defense counsel, expressing their clients' desire to move the case along, then suggested that the Court "set a motion schedule, and we'll file those motions within that schedule without awaiting a superseding indictment . . . ." Id. The magistrate judge then made motions due September 28 and set oral argument for November 27. That hearing was later rescheduled to December 4 at the government's request.

At the December 4 hearing, when asked about the status of the death penalty determination, the government stated: "I'm sort of hesitant to keep

7

predicting. But the bottom line is there's a one-count Hobbs Act indictment, and that's what we're litigating now." Id. at 179. The government also represented that "the Department of Justice is proceeding with that process," but there had not yet been a meeting between the U.S. Attorney's Office and the Capital Review Committee in Washington. Id. at 179-80. Defense counsel for Black agreed that "[w]e're proceeding as if this is a noncapital case at this point." Id. at 180.

While the parties litigated their motions, the government developed further evidence in connection with Harper's murder. In particular, Antoine Callahan entered a plea of guilty in another criminal case on February 14, 2014. As part of his plea agreement, Callahan agreed to cooperate with the government and to testify at the trial of the defendants on the Harper murder and robbery.

On December 12, 2014, the Grand Jury returned a superseding indictment. It included additional charges and added two new defendants, John Coronado and Amilcar Ramos. Count One charged the Hobbs Act Conspiracy count from the original indictment. The additional charges arising from the 2009 robbery and murder of Harper were Counts 2-5, and included a substantive Hobbs Act Robbery count, a kidnapping count asserting that the crime resulted in Harper's

death in violation of 18 U.S.C. § 1201(a) (the "Kidnapping count"), and two

firearms charges for violations of 18 U.S.C. §§ 924(j) and 924(c) (together, the

"Firearms counts").  Each of the original three defendants were charged in

Counts 1-5.  The two new defendants were both added to Count One.  One was

named as well in Counts 2-5, and the other was named in Counts Two, Three,

and Five.  Two of the new charges, Counts Three and Four, were death-eligible

charges, and Count Three, the charge of Kidnapping resulting in death, carried a

mandatory minimum sentence of life imprisonment.  See 18 U.S.C. § 924(j)(1); 18

U.S.C. § 1201(a)(1).

The additional charges added by the superseding indictment also included

four counts associated with a robbery of Morris Singer on or about January 4,

2010 (the "Singer Counts").  Those charges were Hobbs Act Conspiracy, Hobbs

Act Robbery, a kidnapping charge, and a firearms charge.  These charges were

brought against only Green and Black.

On January 13, 2015, approximately one month after the filing of the

superseding indictment, the government advised the defendants that it would

not be seeking the death penalty.  Following the government's production of

discovery on the newly charged offenses and to the newly charged defendants,

9

the defendants engaged in extensive motion practice. In addition, shortly after the superseding indictment was filed, Green requested new counsel. Green's new counsel was appointed on February 3, 2015, but unexpectedly died on September 21, 2016. Green's third attorney was appointed on September 29, 2016. Issues of defense counsel conflict also had to be resolved. The defendants requested numerous extensions to file their submissions in support of their motions, and to file their objections to the magistrate judge's lengthy Report and Recommendation in response to those motions. That Report was adopted by the district court, which then addressed severance motions filed by the defendants.[3]

On October 27, 2017, four days before the trial was due to commence, Green filed a motion to dismiss the superseding indictment on the ground that the five years and seven months of delay between the original one-count indictment and the trial violated his speedy trial rights under the Sixth Amendment. Black and Rodriguez promptly joined the motion. The court and

---

[3] On October 19, 2017, the district court granted Coronado's motion to sever his trial from the other defendants pursuant to Bruton v. United States, 391 U.S. 123 (1968). On November 17, 2017, Coronado pled guilty to Count 2 of the Superseding Indictment, which charged him with Hobbs Act Robbery and Extortion. Coronado subsequently testified at trial against the defendants here.

10

parties agreed that the trial would proceed as scheduled and the motion would be addressed thereafter.

The trial began on October 31, 2017, and concluded on January 18, 2018. The jury acquitted Green and Black on the Singer Counts and acquitted Ramos on every count brought against him. The jury was unable to reach a verdict on the five Harper Counts brought against Green, Black and Rodriguez.

On February 8, 2018, the district court granted the defendants' motion to dismiss the superseding indictment on constitutional speedy trial grounds.[4] Calculating the pretrial delay from the filing of the original indictment, the court found that there had been approximately sixty-eight months of delay before trial. It separately calculated that each of the three defendants had been detained for over five years, seven months.

In examining the reasons for the delay, the district court could detect no deliberate delay by the government. It found, however, that there was considerable delay that was valid and considerable other delay that was

---

[4] Just two weeks prior to the decision, this court had reversed a conviction in the Western District of New York on speedy trial grounds and admonished the district court for its "failure . . . to comply with [its] obligation to bring defendants to a speedy and public trial." United States v. Tigano, 880 F.3d 603, 619 (2d Cir. 2018) (citation omitted).

11

"neutral," as that term is understood in Sixth Amendment jurisprudence. The neutral delay chargeable to the government included its "mishandling" of the death-penalty determination, which resulted in the Department of Justice not reaching a decision for two years, ten months, and six days after the initiation of the prosecution. The district court also found that substantial delay was attributable to the government's decision to supersede the indictment. Five months of delay were also attributed to the government's conduct during discovery. Another five-and-a-half months of delay was caused by the government's failure to produce the defendants or witnesses for pretrial hearings. Finally, approximately four months of delay were attributed to the government because of the distance between Buffalo and the institutions in which the defendants were detained, which made it difficult for their attorneys to consult with them.[5] Some of these delays were overlapping and they largely occurred in the period before the superseding indictment was filed.

---

[5] As explained at oral argument of this appeal, due to disciplinary infractions and separation orders, Black was moved among several institutions pending trial, many of them outside New York and at a considerable distance from the Buffalo courthouse.

12

The district court also attributed some neutral delay to the court and to the defendants. It attributed six months to the court's scheduling delays and eight-and-one-half months to the requests for extensions and adjournments by defendants Black and Rodriguez.

The court found that the defendants had consistently asserted their rights to a speedy trial and had been prejudiced by the delay. While the defendants had not alleged any specific impairments to their ability to present a defense, they had suffered for over two years from the specter of facing the death penalty, and for over five years from the oppressive conditions of pretrial detention.

Balancing all of the factors identified in Barker v. Wingo, 407 U.S. 514 (1972), the district court concluded that the defendants each suffered over sixty-eight months of prejudicial delay and that the delays were principally chargeable to the government. It dismissed the superseding indictment for a violation of the defendants' Sixth Amendment rights, and on February 20, 2018, denied the government's motion for reconsideration.

In denying reconsideration, the district court acknowledged that the government had advocated against delaying pretrial proceedings pending a death-penalty decision, but observed that the government's representations that

13

this could become a death-eligible case had prompted the magistrate judge to postpone pretrial motions in the interest of economy, which had resulted in delay. The district court also acknowledged that Green had calculated 650 days' worth of extensions and adjournments attributable to the defendants, while the district court had attributed only eight-and-a-half-months of delay to the defendants. The district court explained that some of that delay was not attributable to the defendants because it occurred during the period before the defendants were advised that the government would not seek the death penalty. Finally, it acknowledged that none of the defendants had moved to sever their trials on the basis that their Sixth Amendment rights to a speedy trial were being violated. None of these, or the other issues described in its opinion, however, caused the court to alter its dismissal order.

## DISCUSSION

The government appeals the dismissal of the five counts associated with the robbery, kidnapping and murder of Harper that are Counts 1-5 in the superseding indictment. It asserts that there was no violation of the Sixth Amendment's Speedy Trial Clause ("Speedy Trial Clause"), and that the district

14

court erred in determining that the defendants' rights under the Speedy Trial Clause had been violated.

## 1. The Speedy Trial Right

The Sixth Amendment to the United States Constitution provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

U.S. Const. amend. VI (emphasis added).

This is the third occasion in recent years that the court has examined prosecutions pursued in the Western District of New York to determine whether dismissal is required by the Speedy Trial Clause. See United States v. Tigano, 880 F.3d 602 (2d Cir. 2018); United States v. Pennick, 713 F. App'x 33 (2d Cir. 2017).[6] As a result, the fundamental rights secured by the Clause need only be

---

[6] In January 2014, Pennick moved to dismiss the two charges against him that had been pending for four years. Pennick, 713 F. App'x at 34. A second superseding indictment filed in May 2014 charged Pennick with eleven additional counts. Id. The district court dismissed the two original charges for a violation of the Speedy Trial Clause and we affirmed. Id. We "express[ed] no

15

summarized here.  See Tigano, 880 F.3d at 611 (citing Klopfer v. North Carolina, 386 U.S. 213, 223 (1967)).

The Speedy Trial Clause is "designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."  United States v. MacDonald, 456 U.S. 1, 8 (1982).  The rights guaranteed by the Speedy Trial Clause cannot be waived through mere failure to promptly assert them.  Barker v. Wingo, 407 U.S. 514, 529-30 (1972); Tigano, 880 F.3d at 611.  To determine when a violation of the Speedy Trial Clause has occurred, we apply the four-part balancing test established by the Supreme Court in Barker.  We look to the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. 407 U.S. at 530; see also United States v. Abad, 514 F.3d 271, 274-75 (2d Cir. 2008) (applying the four-part Barker test).

_____

view" as to the merits of any motion that Pennick might bring to dismiss the remaining eleven counts on speedy trial grounds.  Id. at 36.

Sixth Amendment jurisprudence recognizes that "different weights should be assigned to different reasons" for delay. Tigano, 880 F.3d at 612 (citing Barker, 407 U.S. at 531). We recently described the three broad categories of delay and the varying weights accorded to each:

> [D]eliberate attempts to delay trial weigh[] most heavily against the government, valid reasons for delay such as missing witnesses are taken off the scale entirely, and reasons of negligence or overcrowded dockets are weighted somewhere in the middle because the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

Id. at 612-13 (citation omitted). The third category of delay -- such as "misunderstandings" or a court's inefficiencies -- is referred to as "neutral" delay. Id. at 616 (citation omitted).

The presumption that pretrial delay has prejudiced the accused "intensifies over time." Doggett v. United States, 505 U.S. 647, 652 (1992). Accordingly, the "toleration" of negligence in bringing a defendant to trial "varies inversely" with the degree to which delay is protracted. Id. at 657. The length of time between accusation and adjudication, however, is not dispositive of the speedy trial analysis.

> [I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect

both upon the rights of the accused and upon the ability of society to protect itself.

United States v. Ewell, 383 U.S. 116, 120 (1966).

## 2. Attachment of the Speedy Trial Right at Time of Adversarial Proceedings[7]

The rights guaranteed by the Sixth Amendment attach in "criminal prosecutions" for the benefit of an "accused." U.S. Const. amend. VI. Accordingly, Sixth Amendment rights attach at the time a criminal defendant is accused of a crime, which is customarily through presentment on an arrest complaint or the filing of an indictment or information. They do not attach at arrest.

This reading derives directly from the words of the Constitution. "On its face, the protection of the [Sixth] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been

---

[7] The majority notes that neither party has raised the issue of attachment on appeal, and that the issue was not addressed by the district court. Because the time of attachment of Sixth Amendment rights presents a pure question of law, because no Sixth Amendment analysis should proceed without reaching this threshhold legal issue, and because I believe that the majority's statement of the law is not only wrong but will mislead both district courts and litigants in ways that may have profound and deleterious effects on the administration of justice, I address the merits of the attachment question. We both believe, apparently, to borrow a phrase from the majority opinion, that the other's approach will "revolutionize Sixth Amendment speedy trial jurisprudence."

18

'accused' in the course of that prosecution." United States v. Marion, 404 U.S. 307, 313 (1971); see also Rothgery v. Gillespie Cty., 554 U.S. 191, 194 (2008) (right to counsel applies at the first appearance before a judicial officer). The Court explained in MacDonald that the "literal reading" of the Amendment suggests that the rights under the Speedy Trial Clause attach "only when a formal criminal charge is instituted or a criminal prosecution begins." MacDonald, 456 U.S. at 6. We have also observed that the "'key Sixth Amendment issue is whether [the accused] was either arrested or subjected to substantial restrictions for purposes of answering a criminal charge.'" United States v. Jones, 129 F.3d 718, 724 (2d Cir. 1997) (quoting United States v. Bloom, 865 F.2d 485, 491 (2d Cir. 1989)) (emphasis in Jones).

Accordingly, the Sixth Amendment right of the accused to a speedy trial "has no application beyond the confines of a formal criminal prosecution." Doggett, 505 U.S. at 655; see also United States v. Sorrentino, 72 F.3d 294, 297 (2d Cir. 1995) (speedy trial right had not attached where "there was no restraint on Sorrentino's liberty and no charges were filed against him following the first arrest"); Cowart v. Hargett, 16 F.3d 642, 645 (5th Cir. 1994) ("A defendant's speedy trial rights attach only when he is formally charged with a crime or

19

actually restrained in connection with that crime." (citation omitted)).  "[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial" is "presumptively prejudicial."  Doggett, 505 U.S. at 651 (emphasis added) (citation omitted).  The provisions of the Sixth Amendment "afford no protection to those not yet accused, nor would they seem to require the government to discover, investigate, and accuse any person within any particular period of time."  Marion, 404 U.S. at 313.

As far back as 1989, we applied these principles and held that "the key Sixth Amendment issue is whether [the defendant] was either arrested or subjected to substantial restrictions for purposes of answering a criminal charge."  Bloom, 865 F.2d at 491.  Because the defendant had been released from custody following his arrest without being subjected to any formal charges, we held that the restrictions imposed by his arrest and questioning "were intended only to protect an ongoing investigation and did not trigger his Sixth Amendment rights" under the Speedy Trial Clause.  Id.

The majority acknowledges that the Sixth Amendment right to counsel attaches at the time an indictment or information is filed or "at the first appearance before a judicial officer at which a defendant is told of the formal

20

accusation against him and restrictions are imposed on his liberty." <u>Rothgery</u>, 554 U.S. at 194. It asserts, however, that the Sixth Amendment rights to counsel and to a speedy trial attach at different points in a defendant's journey through the criminal justice system.

This distinction between the two Sixth Amendment rights is critical to the majority's holding. Because it finds that the constitutional right to a speedy trial attaches at an arrest, it concludes that the period of delay before trial is measured from that arrest for any charges that arise from the "same conduct" underlying that arrest, no matter when those charges are filed. Because of that conclusion, it finds it would be "inappropriate" to assign each charge against a defendant its own time period for a speedy trial based on the time an indictment or information is filed or the defendant is presented on an arrest complaint containing that charge.

The text of the Sixth Amendment does not allow for such a distinction between these two constitutional rights. Both rights apply in "criminal prosecutions" for the benefit of "the accused." U.S. Const. amend. VI; <u>see</u> <u>United States v. Gouveia</u>, 467 U.S. 180, 188 (1984) (relying on these Sixth Amendment terms in determining the point at which Sixth Amendment rights attach). The

majority's approach would give the same words in the Constitution two different meanings. Cf. United States v. Dixon, 509 U.S. 688, 704 (1993) ("[I]t is embarrassing to assert that [a] single term . . . has two different meanings . . . ."). In light of the clear text of the Sixth Amendment and governing precedent, I would reaffirm that the Sixth Amendment right to a speedy trial, like the Sixth Amendment right to counsel, attaches at the initiation of adversarial judicial proceedings. This can be through presentment on an arrest complaint or the filing of an indictment or information.

The majority contends that Marion, Dillingham v. United States, 423 U.S. 64 (1975), MacDonald, and Betterman v. Montana, 136 S. Ct. 1609 (2016), establish that the Speedy Trial Clause right attaches at arrest and not at the time a defendant is presented on an arrest complaint. I disagree. Through a series of cases beginning with Marion, the Supreme Court has consistently held that the rights protected by the Speedy Trial Clause attach prior to the filing of an indictment or information. In doing so, it has frequently used the term "arrest" to indicate as much. But, beginning in Marion, and in decisions that followed, the Court has employed more concrete formulations to describe more precisely the point at which the rights attach. As explained in Marion, it is the "holding to

22

answer a criminal charge" following an arrest that triggers the attachment of the Sixth Amendment's speedy trial rights.  Marion, 404 U.S. at 320; see also MacDonald, 456 U.S. at 6, 8; Dillingham, 423 U.S. at 65.  I see little daylight between Marion's formulation and the formulation in Rothgery that the right to counsel under the Sixth Amendment "applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him." Rothgery, 554 U.S. at 194.

In the right to counsel context the Court has had multiple occasions to be precise about the point at which a "criminal prosecution" renders a defendant "accused."  The Supreme Court has made clear that Sixth Amendment rights attach at "the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  Rothgery, 554 U.S. at 198 (quoting Gouveia, 467 U.S. at 188).  It is at that point that "the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law."  Id. (citation omitted).

23

I also perceive no tension with the interests which the Supreme Court has identified as protected by the Speedy Trial Clause in holding that the attachment of the rights protected by the Clause begins, where no indictment or information has yet been filed, not at arrest but at presentment on an arrest complaint. The Sixth Amendment's liberty interests, whether addressed to the right to counsel or to a speedy trial, are those that accompany a prosecution, not the act of arrest. The right to be free from a wrongful arrest is largely protected by the Fourth Amendment, not the Sixth.

**3. Impact of Superseding Indictment on Sixth Amendment Rights**

The Supreme Court has used the <u>Blockburger</u> test to determine when a violation of the Sixth Amendment right to counsel in connection with one criminal charge fatally undermines the prosecution on another charge. <u>See</u> <u>Blockburger v. United States</u>, 284 U.S. 299 (1932). That same test should be used to determine when the Sixth Amendment right to a speedy trial attaches. If the new charge is a separate offense, as determined under <u>Blockburger</u>, then the Sixth Amendment right attaches at the time the superseding indictment including that charge is filed. If not, then the right attaches at the same time as it attached to the original offense from which it cannot be separated.

In <u>Texas v. Cobb</u>, 532 U.S. 162 (2001), the Supreme Court stressed, as it had in <u>MacDonald</u>, that the Sixth Amendment's protections apply only after the initiation of adversarial judicial proceedings. <u>Id.</u> at 167. In <u>Cobb</u>, the defendant confessed to and was indicted for a burglary. He was thereafter advised of his <u>Miranda</u> rights and questioned. He then confessed to the murder of two victims who lived in the house he had burglarized. <u>Id.</u> at 165. The Supreme Court held that the Sixth Amendment right to counsel is "'offense specific,'" and does not automatically attach "to crimes that are factually related to those that have actually been charged." <u>Id.</u> at 167 (citation omitted). It concluded that the right to counsel attaches to an uncharged offense only if that offense "would be considered the same offense under the <u>Blockburger</u> test." <u>Id.</u> at 173. It explained, "we could just as easily describe the Sixth Amendment as 'prosecution specific,' insofar as it prevents discussion of charged offenses as well as offenses that, under <u>Blockburger</u>, could not be the subject of a later prosecution. And, indeed, the text of the Sixth Amendment confines its scope to 'all criminal <u>prosecutions</u>.'" <u>Id.</u> at 173 n.3 (emphasis in <u>Cobb</u>). Applying this analysis, the Court held that the Sixth Amendment right to counsel did not bar

police from interrogating the defendant regarding the murders and that his confession to those murders was admissible at trial.  Id. at 174.

Under Blockburger, two charges are considered separate offenses if "[e]ach of the offenses created requires proof of a different element."  Blockburger, 284 U.S. at 304.  "[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Id.  If the charges fail this test, they are considered to be the "same offense" for purposes of the Fifth Amendment's Double Jeopardy Clause, id., and the Sixth Amendment.  Cobb, 532 U.S. at 173.  "It is not determinative whether the same conduct underlies the counts; rather it is critical whether the 'offense' -- in the legal sense, as defined by Congress -- complained of in one count is the same as that charged in another."  United States v. Chacko, 169 F.3d 140, 146 (2d Cir. 1999).

The Eleventh Circuit applied a similar framework in rejecting a challenge brought under the Speedy Trial Clause to charges added through an indictment. In United States v. Derose, 74 F.3d 1177 (11th Cir. 1996), the defendants were charged with a drug conspiracy in a criminal complaint following their arrest and indicted almost two years later for that conspiracy and the substantive

offense of drug possession. Finding that the crime of possession "is a distinct and separate offense" from the crime of conspiracy, the Eleventh Circuit held that the prosecution on the possession charge did not violate the Sixth Amendment's Speedy Trial Clause even though the proof of the possession charge "relied on the same facts that supported the conspiracy charge." Id. at 1185.

This court has not yet considered how Sixth Amendment jurisprudence applies to a Speedy Trial Clause issue like the one here. The majority opposes application of the Blockburger test for several reasons. It argues that deployment of the Blockburger test is only viable if the right to a speedy trial is triggered by the filing of a charge, as opposed to an arrest. That observation is certainly correct. After all, application of the Blockburger test requires a comparison of elements of the crimes contained in charging instruments, whether an arrest complaint or an indictment or information. But, for the reasons already explained, I believe that the majority is wrong in concluding both that the right to speedy trial can attach at a time earlier than the right to counsel, and that it attaches at the time of arrest.

The majority resists application of the <u>Blockburger</u> test for other reasons as well. It contends that use of this test would allow courts to ignore that a defendant's liberty interests had been compromised since the original indictment had been filed, could subject a defendant to ceaseless pretrial detention justified by the filing of new charges with new elements, and might allow the government to use an indictment as a placeholder while it contemplated more severe charges. There are several reasons that this parade of horribles need not and certainly should not occur.

A district court is under an obligation at all times to protect the interests embodied in the Speedy Trial Clause. The Speedy Trial Act was enacted to assist courts in that task. <u>See</u> <u>United States v. Loud Hawk</u>, 474 U.S. 302, 304 n.1 (1986) (remarking that Speedy Trial Act is generally "more stringent" than Speedy Trial Clause); <u>United States v. Rice</u>, 746 F.3d 1074, 1081 (D.C. Cir. 2014) ("[A]s a number of courts have noted, it will be an unusual case in which the [Speedy Trial] Act is followed but the Constitution violated." (citation omitted)).

Moreover, a court is under no obligation to delay scheduling a trial on an indictment until the government completes an ongoing investigation that may or may not lead to the filing of additional charges. Even after a superseding

28

indictment is filed, a court has the discretion to proceed with trial on the originally-filed charges alone if it determines that further delay to permit discovery and motion practice on the new charges would violate the defendant's rights. A verdict at that trial will bar a future prosecution to the extent new charges are not separate offenses, as measured under <u>Blockburger</u>. Moreover, as described below, should the court determine that there has been undue investigative delay that prejudices a defendant, it may dismiss the new charges as brought in violation of the Due Process Clause.

I believe that application of the uncontroversial and well-established principles found in Sixth Amendment jurisprudence will fully protect a defendant's rights. Indeed, I believe that any other result invites manipulation of the criminal justice system and interferes improperly with the executive's duty to investigate criminal activity with care and to exercise its discretion to file charges with prudence. After all, if the defendants here had been brought to trial at any point in 2014 on the single charge contained in the 2012 indictment, the Double Jeopardy Clause would not have prevented the Grand Jury from returning a new indictment against them in 2014 containing each of the additional charges that were included in the 2014 superseding indictment. The only restraint under the

law would have been that supplied by the Due Process Clause. While the executive may have chosen to allocate its resources differently, the law would not have required it to do so. The result should be no different simply because the district court did not schedule a timelier trial on the Hobbs Act Conspiracy charge pleaded in the original indictment.

Two other observations about this very prosecution underscore this point. The December 2014 superseding indictment added two new defendants and charged both of them in counts arising from the 2009 Harper robbery and murder.[8] With respect to those defendants, the length of delay in bringing them to trial on those counts clearly is measured from the time they were first charged in the superseding indictment in 2014, and not from the 2009 murder. Similarly, the superseding indictment charged the appellees here not only with additional crimes related to the Harper robbery and murder, but also the Singer Counts. The length of delay on those counts would similarly be measured from the time of the superseding indictment, and not from the 2010 Singer robbery. There is no principled basis to treat the four new charges relating to the Harper robbery and

_____

[8] One of those two defendants, John Coronado, pleaded guilty before trial and was a government witness at trial. Another, Amilcar Ramos, was acquitted at trial on all counts.

murder as to the defendant-appellees in any different way than the charges

described in these two fact patterns so long as these four new charges are

"separate" offenses for purposes of <u>Blockburger</u> from the Hobbs Act Conspiracy

charge in the 2012 indictment.

This is a particularly poor vehicle to create the new law proposed by the

majority. First, the majority does not suggest that the government bears any

significant responsibility for any delay that occurred between the filing of the

superseding indictment and the trial. Nor did the district court. As described

further below, that period of close to three years is almost entirely attributable to

motions made by the defendants. Second, the district court was clear that it

found no deliberate delay by the government at any time and acknowledged that

the government had advocated in 2012 against delaying pretrial proceedings

pending a death-penalty decision. There is certainly no basis on the record

before us to find that the government engaged in any manipulation of the kind

that the majority fears may occur on occasion. Should there be a record of such

abuse, the law as it currently exists provides defendants with a remedy.

Finally, the majority adopts the "same conduct" test, which is a test

recently created by the First Circuit in <u>United States v. Handa</u>, 892 F.3d 95, 106-07

31

(1st Cir. 2018).  The majority holds that where charges in an original and superseding indictment arise from the "same conduct", the relevant period for purposes of the Speedy Trial Clause is the period measured from the original arrest or first indictment.[9]

In Handa, the First Circuit declined to apply a Blockburger analysis in determining whether a successive prosecution violated the Speedy Trial Clause. The defendant in Handa was indicted in March 2011 on fraud charges while living abroad.  He was arrested in 2017 when he reentered the country.  Id. at 99. Following his arrest, and shortly after the defendant moved to dismiss the indictment for a violation of his Sixth Amendment right to a speedy trial, the government filed a superseding indictment that contained the same fraud counts and a single new count of bank fraud.  The district court dismissed all of the

---

[9] The majority characterizes my dissent as suggesting that the filing of a superseding indictment with new charges starts a new relevant time period.  I do not suggest that the filing of a superseding indictment alters the clock for any previously filed charge.  That clock remains unaffected by the filing of additional charges.  Because Sixth Amendment rights are offense specific, the relevant start of the speedy trial period for any new charge will be the date the superseding indictment is filed or an earlier date as determined by application of the Blockburger test.

charges, and the government appealed only the dismissal of the bank fraud charge. Id. at 100.

The First Circuit held that the constitutional speedy trial right on the bank fraud charge should be deemed to run from the date of the original indictment. Id. at 105. Because the Sixth Amendment Speedy Trial Clause and the Fifth Amendment's Double Jeopardy bar arise from their "own unique historical roots," it viewed "with skepticism the government's call for us to import Double Jeopardy principles into our Sixth Amendment speedy trial jurisprudence." Id. (citation omitted). Instead, the First Circuit constructed a diligence and relatedness test for determining when the speedy trial right attaches to a later-filed charge. It held that, in circumstances like the one before it, the bringing of an additional charge would not "reset the Sixth Amendment speedy trial clock" where

> (1) the additional charge and the charge for which the defendant was previously accused are based on the same act or transaction, or are connected with or constitute parts of the common scheme or plan previously charged, and (2) the government could have, with diligence, brought the additional charge at the time of the prior accusation.

Id. at 106-07.

The First Circuit's approach in <u>Handa</u> effectively requires that all possible criminal charges be brought at the time of the initial prosecution, or risk their bar unless a showing of diligence can be made. The First Circuit's test borrows word-for-word much of the joinder rule in the Federal Rules of Criminal Procedure, <u>see</u> Fed. R. Crim. P. 8(a). But that rule is permissive, rather than compulsory, in nature. It provides that an indictment or information "<u>may</u>" charge a defendant with two or more offenses in one indictment if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." <u>Id.</u> (emphasis added).

The <u>Handa</u> approach, adopted by the majority, effectively imposes through the Speedy Trial Clause the very requirements the Supreme Court has rejected elsewhere. In the double jeopardy context, the Supreme Court has explicitly rejected any requirement that charges arising out of the same criminal transaction be brought in the same prosecution. <u>See</u> <u>Dixon</u>, 509 U.S. at 704-05; <u>United States v. Felix</u>, 503 U.S. 378, 386 (1992). And, as a matter of due process, it has rejected a requirement of prosecutorial expedition. <u>United States v. Lovasco</u>, 431 U.S. 783, 790-91 (1977). The First Circuit also appears to have overlooked

34

that the <u>Blockburger</u> test has already been "import[ed]" into the Sixth Amendment in the right to counsel context.  <u>Compare</u> <u>Handa</u>, 892 F.3d at 105, <u>with</u> <u>Cobb</u>, 532 U.S. at 173.

Sixth Amendment jurisprudence is clear that the protections offered by that Amendment are offense specific.  <u>See</u> <u>Cobb</u>, 532 U.S. at 167; <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991); <u>MacDonald</u>, 456 U.S. at 7; <u>United States v. Moore</u>, 670 F.3d 222, 235 (2d Cir. 2012).  Where a successive charge is not barred by a <u>Blockburger</u> analysis or the relevant statutes of limitations, then a defendant must rely on the protections provided by the Due Process Clause of the Fifth Amendment.

The majority refers to five other circuit cases which used the date of first indictment in their analysis of Speedy Trial Clause claims.  These five decisions did not use the "same conduct" test adopted by the majority or the <u>Blockburger</u> analysis set out above.  Each of them used a single time frame in their <u>Barker</u> analysis and assumed, albeit without much discussion or analysis, that the relevant time period for Speedy Trial Clause purposes is the period between the initial indictment and the start of trial.  These five decisions in our sister circuits provide little support for the path the majority has embarked upon.

35

Only one of the five cases, United States v. Battis, 589 F.3d 673 (3d Cir. 2009), reversed a conviction.  It comes the closest to addressing the effect of a superseding indictment on its Barker analysis.  In Battis, the defendant was first charged by state authorities in connection with his firing of a weapon at a police officer in 2003.  The defendant was indicted by federal authorities for possession of a firearm by a convicted felon in 2004, id. at 675, and in a superseding indictment in 2006 for possession of ammunition by a convicted felon.  Both counts charged a violation of 18 U.S.C. § 922(g)(1) and arose out of the same shooting incident.  Id. at 676.  Forty-five months following the initial indictment, the federal trial commenced.  Id.  After conducting an analysis of the Barker factors, the Third Circuit vacated Battis's conviction.  Id. at 684.  In a footnote, the Third Circuit wrote:  "We also hold that the speedy trial right was not affected by the filing of a superseding indictment in 2006."  Id. at 679 n.5.

In United States v. Black, 830 F.3d 1099 (10th Cir. 2016), the court rejected a Speedy Trial Clause challenge to a conviction where it calculated that there were roughly twenty-three months of delay before trial, after aggregating each of the time periods during which an indictment was pending and excluding the periods between dismissal and the filing of a superseding indictment.  Id. at

1112. Each of the indictments contained the same charges: conspiring to distribute cocaine, using a telephone to facilitate the conspiracy, and possessing cocaine with intent to distribute. Id. at 1103 n.1, 1104 n.4, 1106 n.11, 1107 n.15.

In United States v. Jeanetta, 533 F.3d 651 (8th Cir. 2008), the court rejected a defendant's claim that the fifteen-month delay between his indictment on drug charges and trial had violated his Sixth Amendment rights. Id. at 656-57. Eight months after his indictment, the defendant was found and arrested. Two handguns were seized during that arrest. Weeks before his trial, a superseding indictment added firearms charges to the drug charges. Id. at 653-54.

In United States v. Oriedo, 498 F.3d 593 (7th Cir. 2007), the court affirmed a conviction after finding that there was a delay of almost three years between the original indictment and trial. During that interval, there were four superseding indictments to add defendants and substantive drug charges to the original drug conspiracy charge. Id. at 597-98. In its Barker analysis, the Seventh Circuit applied the almost three-year period of delay to even those substantive drug counts added in the superseding indictments. Id. at 599. It concluded that it did not need to "decide the appropriate treatment of delays occasioned by superseding indictments . . . because, even if we were to conclude that every

such delay should be charged to the government, Mr. Oriedo remains responsible for multiple additional and significant delays." Id. at 599.

Finally, in United States v. Milhim, 702 F.2d 522 (5th Cir. 1983), the defendant's Speedy Trial Clause challenge to his conviction was also rejected. In Milhim, there was a seven-month delay between an initial indictment and trial. Id. at 525. The Fifth Circuit did not separately discuss the shorter time period between the superseding indictment and trial, even though that second indictment had added several new charges.

**4. Investigative Delay**

To the extent that there has been investigative or other delay in bringing a charge against a defendant, the prejudice caused by that passage of time is "primarily" addressed through the Due Process Clause of the Fifth Amendment and the relevant statutes of limitations. MacDonald, 456 U.S. at 8. Similarly, "[a]ny undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." Id. at 7. Prosecutors are, however, under no obligation to file charges "as soon as probable cause exists but before they are satisfied they will be able to

establish the suspect's guilt beyond a reasonable doubt." <u>Lovasco</u>, 431 U.S. at 791.

Where it is shown that pre-indictment delay "caused substantial prejudice to" the right to a fair trial and that the delay "was an intentional device to gain tactical advantage over the accused," the Due Process Clause requires dismissal of the indictment. <u>Marion</u>, 404 U.S. at 324. While the Supreme Court has declined to define the precise circumstances that will constitute a violation of a defendant's rights under the Due Process Clause for undue delay, <u>Lovasco</u>, 431 U.S at 797, "proof of actual prejudice" to a defendant makes a due process claim "concrete and ripe for adjudication." <u>Id.</u> at 789.

We have held that "where pre-indictment delay has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain a tactical advantage over the accused,'" then a violation of a defendant's due process rights may be found. <u>United States v. Cornielle</u>, 171 F.3d 748, 752 (2d Cir. 1999) (quoting <u>Marion</u>, 404 U.S. at 324); <u>see also</u> <u>United States v. Ray</u>, 578 F.3d 184, 199-200 (2d Cir. 2009); <u>Sorrentino</u>, 72 F.3d at 297. Prejudice from an impairment of the right to a fair trial "is commonly

demonstrated by the loss of documentary evidence or the unavailability of a key witness." Cornielle, 171 F.3d at 752.

## 5. Application of Blockburger Test to Counts 1-5

As just discussed, Sixth Amendment rights are offense specific. Therefore, a court must decide as to each count whether a defendant's right to a speedy trial was violated. To do so, the court must first consider when Sixth Amendment rights attached to the count.

In this case, the Hobbs Act Conspiracy charge first appeared in the original indictment filed on March 6, 2012 and was incorporated into the superseding indictment as Count One. The defendants' Sixth Amendment rights attached as to that charge, therefore, on March 6, 2012. With a limited exception, the defendants' Sixth Amendment rights for the other four Harper counts added through the superseding indictment did not attach until the superseding indictment was filed on December 12, 2014.

Using a Blockburger analysis, the Hobbs Act Robbery and Kidnapping charges are separate offenses from the Hobbs Act Conspiracy charged in the original indictment. A substantive crime is a separate offense from a conspiracy to commit that substantive crime. Felix, 503 U.S. at 389; United States v. Sessa,

40

125 F.3d 68, 71 (2d Cir. 1997). Kidnapping is also a separate offense from the Hobbs Act Conspiracy charge; each requires proof of an element not contained in the other. Compare 18 U.S.C. §§ 1951(a)(b)(1), (b)(2) with 18 U.S.C. § 1201(a).

The two Firearms counts charged in Counts Four and Five, however, are the same offense as the Hobbs Act Conspiracy charged in Count One to the extent that a conviction under either count rests on a jury finding a violation of the Hobbs Act Conspiracy charged in Count One. Count Five charges a violation of § 924(c), which addresses use of a firearm during a "crime of violence."[10] The crimes of violence identified in Count Five were the crimes charged in Counts One, Two, and Three of the superseding indictment. Count Four charges a violation of § 924(j), which addresses the use of a firearm to cause a death during a "crime of violence."[11] The crimes of violence identified in Count Four are again the crimes charged in Counts One, Two, and Three of the superseding

---

[10] 18 U.S.C. § 924(c)(1)(A) in pertinent part provides that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence" be punished as set out in the statute. (Emphasis added.) Sections 924(c)(1)(A)(ii) and (iii) provide enhanced penalties for brandishing and discharging the firearm.

[11] Section 924(j) provides enhanced penalties for a defendant "who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm." 18 U.S.C. § 924(j).

indictment.  To the extent, therefore, that the Hobbs Act Conspiracy charged in Count One serves as the predicate crime of violence for the two Firearms counts,[12] those counts charge the same offense as the Hobbs Act Conspiracy count.[13]  For the remainder of this discussion, however, it will be assumed that the government will not rely on Count One as a predicate crime of violence to support a conviction for either Firearms count should the dismissal of the superseding indictment be reversed.

## 6.  The Superseding Counts:  Counts 2-5

For the reasons already explained, the defendants' Sixth Amendment rights on the four counts added in the superseding indictment attached at the

---

[12] This court recently held that Hobbs Act Conspiracy categorically constitutes a "a crime of violence" for the purposes of § 924(c).  United States v. Barrett, 903 F.3d 166 (2d Cir. 2018).

[13] This court has previously held that violent crime predicates and § 924(c) firearms offenses are not the "same offense" for the purposes of multiple punishment.  United States v. Mohammed, 27 F.3d 815 (2d Cir. 1994).  That conclusion does not alter the analysis here.  The Double Jeopardy Clause of the Fifth Amendment not only protects against a second prosecution for the same offense, it protects as well "against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense."  Brown v. Ohio, 432 U.S. 161, 165 (1977).

time that indictment was filed, which was December 12, 2014. Those new counts were Hobbs Act Robbery, Kidnapping, and two Firearms charges.[14] While almost three years elapsed before the defendants' trial began on October 31, 2017, there is no basis in this record to find that these counts must be dismissed for a violation of the Speedy Trial Clause.

The district court found that the government engaged in no deliberate delay during this prosecution and the defendants did not identify any specific impairment from any delay to their ability to defend themselves at trial. While almost three years elapsed between the filing of the superseding indictment before the trial began, there is no significant delay -- whether deliberate or neutral -- that may be properly attributed to actions taken by the court or the government during that period, or to their inaction. Almost all of the time was spent in the ordinary course of responding to the new charges contained in the superseding indictment or was delay that is attributable to the defendants.

---

[14] Green was transferred to federal custody on February 24, 2012 on a complaint charging him with the substantive crime of Hobbs Act Robbery. That charge, however, was effectively dismissed under the Speedy Trial Act once he was indicted on a single count of Hobbs Act Conspiracy, and after 30 days had elapsed without indictment on the substantive charge. 18 U.S.C. § 3161(b). "Any undue delay after charges are dismissed . . . must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." MacDonald, 456 U.S. at 7.

Following the government's production of discovery related to the new charges contained in the superseding indictment, the defense filed omnibus motions. The earliest of these motions was filed on March 30, 2015, and the last was submitted on May 1. Two oral arguments and an evidentiary hearing took place in May, June, and July of 2015. A month was lost between July and August 2015 waiting for a court reporter to file a transcript. From August 2015 to January 2016, the defendants completed the filing of their post-hearing submissions.[15] From January to June 2016, Curcio proceedings took place to determine whether counsel for the two newly added defendants -- John Coronado and Amilcar Ramos -- and for Green had a conflict of interest. After those proceedings concluded, the magistrate judge issued a fifty-seven-page Report and Recommendation on July 6, 2016 ("Report"). The defendants were granted extensions until April 7, 2017 to complete briefing on their objections to the Report. Although some of these extension requests referenced issues with defense counsel obtaining access to their clients, not all did. On April 26, 2017, the district court adopted the Report in full.

---

[15] Green timely filed his post-hearing brief on October 9, 2015, but Rodriguez did not file until January 7, 2016, and Black did not file until January 20, 2016.

At a conference on May 25, 2017, the district court scheduled a trial to begin on October 31, 2017. During this interval, Green's counsel was unavailable for extended periods, codefendant Coronado's motion to suppress was resolved, and the parties' motions in limine were filed and resolved. On October 19, the defendants' motions for severance, with the exception of Coronado's, were denied.

When Green filed his October 2017 motion to dismiss the superseding indictment on the ground that his right to a speedy trial under the Sixth Amendment had been violated, he principally complained that the long delay in his trial was attributable to the government's filing of a superseding indictment twenty-one months after filing the original indictment, and to the government's and his codefendants' motions for extensions of time to file pretrial motion papers. He identified at most four months of the delay that followed the filing of the superseding indictment as attributable to the government.[16]

---

[16] In Green's motion to dismiss the indictment for violation of the Speedy Trial Clause, he calculated 654 days of delay following the filing of the superseding indictment. The motion included a table identifying each delay, including which party sought the delay or was responsible for it. The chart attributes the majority of the delay during the period following the filing of the superseding indictment to extension requests sought by defense counsel. Less than four months of the delay identified in the chart is attributed to the government or to the court.

45

For their part, the magistrate judge and district judge acted with reasonable dispatch. The magistrate judge issued his fifty-seven-page Report within a month of the defendants' massive omnibus motions being fully submitted.[17] With similar efficiency, the district judge ruled on all of the many objections to that Report within a month of those objections being fully submitted.

While the delay of almost three years between the filing of the superseding indictment and the trial is long, the record does not permit a finding that this delay violated the Speedy Trial Clause. The defendants did not make any developed argument below, or on appeal, that their rights under the Speedy Trial Clause were violated because of any particular failure by the government or the court that occurred after the superseding indictment was filed. Equally significant, they have never contended that the Speedy Trial Act was ever violated in this case.

---

[17] Among the motions filed by Green that the magistrate judge denied was a motion to dismiss Counts 6-9, the Singer Counts, of the superseding indictment for pre-indictment delay in violation of the Due Process Clause of the Fifth Amendment.

The omission of any such argument is easily explained. When the superseding indictment was filed, it added two defendants, four more Harper-related counts, and charges relating to the Singer robbery, a robbery entirely separate from the robbery and murder of Harper. The defendants requested and were granted numerous extensions to pursue their challenges to the indictment and the government's trial evidence. There is no reason to be critical of those many requests. If convicted at trial on the most serious count, they faced a mandatory term of life imprisonment. In each instance the judges supervising the proceedings found the extensions were in the interest of justice.

Reduced to its essence, the defendants complain principally that the government continued its investigation into Harper's murder following the filing of the 2012 indictment and that they suffered from the knowledge that that continuing investigation might yield a superseding indictment that included death-eligible counts. In granting the defendants' Sixth Amendment motion, the district court adopted that argument and emphasized that the defendants suffered throughout the period before the government filed the superseding indictment from the unique anxiety that comes with the looming prospect of the death-penalty. In affirming the dismissal of Counts 2-5, the majority also

47

emphasizes the prejudice to the defendants from the prospect that they might be facing a capital prosecution. Within a month of the filing of the superseding indictment, however, the government notified the defendants that it would not pursue the death penalty. The concern expressed about the nearly three years of uncertainty that the defendants experienced is, therefore, a concern about the government's alleged investigative delay in filing the superseding indictment. But, as discussed earlier in this dissent, to the extent there was any investigative delay in filing new charges, a defendant's right to obtain a dismissal of those charges because of that delay "is protected by the Due Process Clause and by statutes of limitations." MacDonald, 456 U.S. at 8. Such investigative delay, even if the record developed below permitted us to find that it existed, does not constitute a basis for dismissing the four counts added in the superseding indictment pursuant to the Speedy Trial Clause.[18]

Therefore, because the Sixth Amendment does not allow a court to dismiss the four new counts in the superseding indictment because of presumed pre-indictment delay, the present record does not provide a basis to dismiss those

---

[18] As noted above, the defendants moved to dismiss the Singer Counts based on a violation of the Due Process Clause; they did not move to dismiss Counts 2 to 5 of the superseding indictment on such a theory.

counts.  Because the district court's legal analysis of the Sixth Amendment challenge to these four counts was legally flawed, I would reverse its decision to dismiss the four Harper Counts added in the superseding indictment.  Because its fact finding (and the positions taken by the defendants below) foreclose any finding of a Sixth Amendment violation as to these counts, I do not find that a remand is necessary for further development of the record.

**7.  Count One:  Hobbs Act Conspiracy Count**

There was a delay of sixty-eight months in the trial of Count One:  from March 2012 to October 2017.  This is presumptively prejudicial.  I would affirm dismissal of that count, although not for the reasons given by the district court. See Flood v. Just Energy Marketing Corp., 904 F.3d 219, 238 (2d Cir. 2018) (Courts of Appeals may affirm on any grounds that are supported in the record.).

The Sixth Amendment requires significantly more vigilance from both the court and the government than was demonstrated here.  Having not yet held a trial on the Hobbs Act Conspiracy charge when the superseding indictment was filed in December of 2014, the district court should have promptly convened the parties and considered with them whether the trial on the Hobbs Act Conspiracy charge alone should proceed promptly or not.  If the court did not initiate that

49

inquiry, then the government should have requested that it do so. Since that was not done, we are left to speculate how the parties would have weighed that calculus and what positions they would have taken. Whatever positions the parties took, the court should have timely weighed the relevant factors under Barker and set a schedule accordingly. Instead, on the eve of trial in the Fall of 2017 the defendants filed their motion seeking dismissal of all counts in the superseding indictment -- including those counts related to the Singer robbery -- for a violation of their Sixth Amendment speedy trial rights.

Significant delay is also attributable to the fact that the district judge referred pretrial proceedings to the magistrate judge. Even when an able and diligent magistrate judge is managing pretrial proceedings, as was the case here, proceedings are almost invariably more extended than they would be without the additional layer of judicial supervision. Because the parties have a right to appeal any decision made by the magistrate judge, see Fed. R. Crim. P. 59, a magistrate judge is often less likely to rule from the bench and rely on the record created of his or her decision by the court reporter. The time needed to reduce the reasons for a ruling to a written decision adds to the length of proceedings. The parties must also be afforded an opportunity to object to that written

50

decision, and the district court must be given an opportunity to review the

magistrate judge's rulings in light of those objections, further extending the

length of the proceedings. If a district court employs a magistrate judge to assist

it in managing its busy criminal docket, the district court must ensure that any

division of responsibilities does not adversely impact its own duty to schedule a

speedy trial.

I cannot affirm the dismissal of Count One, however, for the reasons on

which the majority places its greatest emphasis. We do not have a record to

support the harshest of the majority's judgments about the government.[19] The

majority acknowledges that the district court did not find any intentional delay

---

[19] The majority finds that the government bears the burden of nine months of delay between April 2012 and December 2012 because of the "threat" that the proceedings might "ultimately turn capital and nullify the work done to date." The majority accuses the government of inaction and indecision over whether to seek the death penalty, and describes it as a "the neglected death-penalty decision." It accuses the government of "dangl[ing]" the prospect of a capital prosecution. It also notes that a new round of pretrial litigation, occasioned by the filing of the superseding indictment, is properly attributable "to the government's poor case management." It asserts that the filing of the superseding indictment effectively "scrubb[ed]" two years and nine months of belabored pre-trial litigation.

by the government. Nonetheless, the majority is highly critical of the government. Its criticism is essentially a criticism that the government continued its investigation of Harper's murder and that the charges accusing the defendants of causing that murder were not filed until almost three years after the defendants were initially indicted.

First, as explained by the Supreme Court, prosecutors are encouraged to investigate crimes thoroughly and to exercise their discretion to prosecute with care.

> Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refused to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of mere speed.

Lovasco, 431 U.S. at 795 (citation omitted).

In any event, as early as May 17, 2012, the government indicated that it did not want to delay the proceedings on the pending one-count indictment because it might one day develop sufficient evidence to file a superseding indictment with a death-eligible count. By August 2, 2012, defense counsel agreed that a motion schedule should be set based on the single charge in the pending indictment, with the understanding that supplemental motions addressed to a

superseding indictment could be filed in the event one were forthcoming.  The

government reiterated at a December 4, 2012 conference that "the bottom line is

there's a one-count Hobbs Act indictment, and that's what we're litigating now."

The Assistant United States Attorney acknowledged that there was a possibility

that a superseding indictment would be filed at some time, but he was hesitant to

make any prediction about that.

Then, having obtained a plea of guilty and cooperation from Callahan on

February 14, 2014, the government obtained a superseding indictment in

December of 2014, and advised the defendants one month later that it would not

be seeking the death penalty.  The district court did not find, and the record does

not permit us to find, that the government was less than diligent in connection

with seeking additional evidence against the defendants or in filing the

superseding indictment with additional counts related to the murder.  We have

no record of what leads the government pursued, what strategies it employed,

how it staffed its investigation, what hurdles it confronted and overcame, or

virtually anything else that would permit us to find that the government was or

was not diligent in pursuing the murder investigation and filing the December

53

2014 superseding indictment. The record does contain, however, the district court's finding that "there is no deliberate delay that this Court can detect."

The majority principally faults the government for its statements in 2012 about when the Department of Justice might make the final decision on whether it would pursue the death penalty. It also faults the government because the specter of potential death-eligible charges hung over the case.[20] For example, the majority attributes to the government significant delay "from the threat that the proceedings would ultimately turn capital and nullify the work done to date."[21] But, the fact that prosecutors would continue their investigation into Harper's murder was neither surprising nor unusual; everyone understood that Harper had been murdered. It was also well understood that the procedural protections surrounding a decision to seek the death penalty are substantial and complex. No final decision regarding the death penalty could be communicated unless and until the government amassed the evidence to file a superseding indictment with

---

[20] The majority criticizes the government for its "inaction and subsequent indecision over whether to seek the death penalty."

[21] While I disagree that any work was nullified by the filing of a superseding indictment, I readily acknowledge that the progress toward a trial date was impacted by that filing and required all the parties and the district court to confront head-on the impact of that filing on the scheduling of trial.

death-eligible charges. And the final decision resided not with the local U.S. Attorney's Office but with the Attorney General of the United States. When the superseding indictment was filed, the decision not to seek the death penalty was promptly communicated.[22]

When a criminal charge is eligible for imposition of the death penalty, there is a process that federal prosecutors are required to follow. They do not have the option of telling the Department of Justice or defendants that they have independently decided not to pursue the death penalty.[23] As reflected in the United States Attorney's Manual,[24] prior to seeking an indictment for an offense potentially punishable by death, a local United States Attorney's Office is required, absent extenuating circumstances, to consult with the Department of Justice's Capital Case Section in Washington, D.C. Ordinarily, the U.S. Attorney must give defense counsel a reasonable opportunity to present information

---

[22] The record does not include information about either the investigative work done by prosecutors or their efforts to comply with Department of Justice death penalty procedures during the period following February 14, 2014, when Antoine Callahan pleaded guilty and decided to cooperate.

[23] The Department of Justice's decades-old decision to remove local discretion over death penalty decisions, even decisions not to pursue the death penalty, was motivated in part by a desire to minimize racial disparities across the nation in death penalty decisions.

[24] U.S. Dep't of Justice, Justice Manual, Chapter 9-10.000.

which may bear on the decision whether to seek the death penalty and must submit its own recommendation to the Capital Case Section, along with extensive documentation.[25] The U.S. Attorney is encouraged to consult with the family of the victim. The case is reviewed by the DOJ Capital Review Committee.[26] The Deputy Attorney General makes a recommendation to the Attorney General and the Attorney General makes a final decision on whether the government should file a notice of intent to seek the death penalty. The prosecutor is instructed to "promptly" inform the district court and counsel for the defendant once the Attorney General has made the final decision. The timing here suggests that the prosecutor had responsibly done the groundwork with the Department of Justice; the "no seek" decision was communicated to the defendants promptly after the filing of the death-eligible counts.

---

[25] In this case, although defense counsel was prepared to present mitigating information, that information was never sought by the government.

[26] The majority notes, with some disapproval, that at the December 4, 2012 conference the government disclosed that it "had not even met with the Department of Justice to discuss whether to seek the death penalty." According to Department of Justice procedures, however, such meetings are only held where a member of the Capital Review Committee requests them or when the prosecutor has recommended seeking the death penalty. U.S. Dep't of Justice, Justice Manual § 9-10.130. There is no indication in the record that either of those circumstances ever occurred here.

Accordingly, I would affirm the dismissal of Count One on the ground that the delay of sixty-eight months between indictment and trial violated the defendants' rights under the Sixth Amendment's Speedy Trial Clause. I reject, however, the majority's conclusion that such a result is required because the "government dangled the prospect of a capital prosecution" over the defendants for two years and ten months. The record does not provide a basis to find the investigative delay that the majority presumes.

## Conclusion

To summarize, I would hold that the Sixth Amendment right to a speedy trial, like other Sixth Amendment rights, attaches at the initiation of adversary proceedings. This is customarily the filing of an indictment or information, or presentment on a criminal complaint.

A corollary to that conclusion is that the speedy trial right is offense specific, and attaches to the charges listed in the complaint, indictment or information. Later-filed charges only relate back to the date of an initial charge for speedy trial purposes when those later charges are the "same offense" as determined through a Blockburger analysis.

Because, under <u>Blockburger</u>, the crimes charged in Counts 2-5 of the superseding indictment are not the same offense as the count charged in the initial indictment (which is repleaded as Count One in the superseding indictment), the length of delay with respect to these counts is measured from the time the superseding indictment was filed, that is, December 12, 2014. With respect to those four counts, any investigative delay that occurred before that time is addressed by the Due Process Clause of the Fifth Amendment, not the Speedy Trial Clause of the Sixth Amendment.

I agree with the majority that the length of delay between the filing of the charge contained in Count One in March 2012 and the beginning of trial in October 2017 is presumptively prejudicial and I would affirm the dismissal of that count. I disagree with the majority's conclusion that that delay is attributable, on this record, to a delay by the government in either its continued investigation of the murder or its death penalty determination.

I believe it would be wrong to conclude from the majority's decision either that prosecutors should defer filing any charge until they have exhausted their investigation and can bring all appropriate charges at one time, or that having filed initial charges prosecutors should not continue to pursue investigative leads

and file a superseding indictment with more charges where it is appropriate to do so. This disturbing case should not make the challenging work of prosecutors and defense counsel more difficult. I believe that the appropriate lesson to draw from this case is that judges and prosecutors must be diligent to ensure that the Sixth Amendment's guarantee of a speedy trial is fully enforced. Defendants must be given timely opportunities to make informed decisions about the scheduling of their trials, courts must carefully manage criminal proceedings so that trials are scheduled with the dictates of the Sixth Amendment and <u>Barker</u> in mind, and a record must be created of those opportunities and the decisions made by all parties and the court.